In the Matter of **MANDALAY SHORES COOPERATIVE HOUSING ASSOCIATION, INC., Debtor.**

**Bankruptcy No. 81–547.**

United States Bankruptcy Court,
M.D. Florida,
Tampa Division.

Sept. 11, 1985.

Charles Medearis, St. Petersburg, Fla., William O'Malley, Clearwater, Fla., Michael Kinney, Tampa, Fla., for debtor.

## ORDER ON CONFIRMATION OF MODIFIED PLAN FOR AN ARRANGEMENT

ALEXANDER L. PASKAY, Chief Judge.

THIS IS a Chapter 11 case and the matter under consideration is whether the "Modified Plan For An Arrangement" (Plan) submitted on June 22, 1984 by the debtor, Mandalay Shores Cooperative Housing Association, Inc. (MSCHA), can be confirmed despite MSCHA's failure to obtain acceptance by at least one class of impaired claims as required by § 1129(a)(10) as amended by the Bankrupt-

cy Amendments and Federal Judgeship Act of 1984, P.L. 98–353 (BAFJA). This Amendment now permits confirmation of a plan if the debtor obtains the affirmative vote of at least one class of claims which is impaired, unlike the former provision which required acceptance by one class irrespective of whether its members were impaired or not.

The salient and important features of the plan under consideration are as follows:

The plan establishes five classes of creditors: Class I consists of claims based on loans made to the corporation by members, directors, or officers during the state court receivership which preceded the commencement of the case in this court. The remaining claims in Class I are the unsecured priority claims (sic). The plan is totally silent as to the identity of the creditors in this class nor does the plan specify the basis of the priority of these claims. Class 2 consists of the general unsecured claims of trade creditors. Class 3 is the category consisting of the claims of directors per (sic) indemnification per bylaws because of pending litigation or similar litigation. (This presumably refers to Article VII, Section 1 of MSCHA's Bylaws which provide for corporate indemnification of directors against claims arising out of acts or actions taken and performed on behalf of the corporation). Class 4 are the claims of former members i.e. members determined by MSCHA not to be in "good standing". Class 5 consists of the interests of members in good standing, i.e. members still loyal to the management.

The plan proposes to pay Class 1 and 2 100% on the effective date of confirmation. Class 3 creditors are to be treated as parties to an executory contract and MSCHA proposes to set aside and reserve an amount, sufficient, in MSCHA's opinion, to satisfy the obligations under those contracts, although the record is devoid of any evidence that these contracts were ever assumed by MSCHA.

The plan further provides that Class 4 claims, the claims of former members, be

treated as unsecured priority claims. Although again the basis of the priority is not specified, one must assume that this status is based on § 507(a)(6) of the Bankruptcy Code. The plan describes this provision as a "compromise and settlement" of the disputed claims comprising Class 4 and proposes to pay $900, to be paid in cash promptly upon confirmation or as soon thereafter as feasible. However, the plan also provides that in consideration for the payment, the claimants are required to forego claims of any kind raised by the plaintiffs against the Debtor and other non-debtor individuals in the civil action now pending in the Circuit Court of Pinellas County Case, #79–12720.

The plan proposes no payment to Class 5 claimants; they are offered to retain membership in MSCHA.

It is without dispute that MSCHA did not solicit, obtain, and present any written acceptance of its plan from anyone.

Even a cursory reading leaves no doubt that Classes 1, 2, and 3 are not impaired. This leaves for consideration an in-depth analysis of the nature of the claims of creditors comprising Class 4 and 5 under the provisions of the plan. In order to accomplish this, it is necessary to examine the factual background of MSCHA and the facts relevant to the resolution of the remaining issues.

MSCHA is a non-profit organization formed by tenants of a large multi-unit apartment complex located in Clearwater, Fla. known as Mandalay Shores Apartments. At the time pertinent to the matter under consideration, the apartment complex was owned by the Department of Housing and Urban Development (HUD), an agency of the United States Government. Sometime in the summer of 1979, it appeared that HUD might attempt to sell the complex to a private entrepreneur who most likely would turn the complex into a condominium project or at least after acquisition would raise the rent of the tenants to such extent that some of the tenants would not be able to remain as tenants in the complex. This possibility was fraught with

far reaching adverse consequences for the tenants, the vast majority of whom were elderly and retired persons who, first, didn't have the funds to purchase any condominium units which they occupied or, second, they certainly wouldn't have been in the position to pay a substantially increased rent even if the complex was not converted into a condominium. This imminent threat of losing their apartments became even more significant in light of the fact that they had enjoyed in the past, some of them for a very long time, extremely advantageous lease arrangements in the complex and paid the rent far below the market rate for an excellent, luxurious facility located in that area of Florida facing the Gulf of Mexico.

Sometime in early August of 1979, the idea of acquiring the project by the tenants from HUD became the subject of an extensive discussion among the tenants. The proponent of the idea, Mr. Jack Burr, submitted a proposition to create an entity, either a non-profit corporation or possibly a cooperative association, which would be in a position to negotiate with HUD for the purchase of the complex. These discussions culminated in the resolution to form a non-profit corporation. On August 7, 1979, the non-profit corporation was, in fact, formed and obtained a corporate charter from the State of Florida. Between August 1 and August 16, 1979, the tenants held numerous meetings at which time it was explained to the persons in attendance that it was necessary to collect at once a $100,000 fund in order to enable the newly formed entity to make an earnest money deposit toward the purchase of the complex. It was proposed first that the tenants would have an option to buy a full membership in the association or place monies in escrow, which funds were to be refunded in the event the association was unable to purchase the complex. A full membership was available only to the tenants who actually lived in the building but escrow membership was available to all who desired to become members, whether they lived in the complex or not. The

funds needed for the down payment were collected without any difficulty and the parties who contributed funds were given a receipt, which in pertinent part reads as follows:

"As you were informed at our general meetings, by unanimous vote your membership certificate when issued after the title to Mandalay Shores Apartment is acquired cannot be sold by you, but you will have the right to surrender the same together with possession of your apartment to the Cooperative Association and will receive full redemption payments including any interest which may have accrued thereon. You are also informed by unanimous vote that in order to prevent any forfeiture of our $100,000 earnest money paid to HUD with our offer on August 10, 1979, there cannot be any redemption of any shares until after HUD accepts our offer and title passes to your co-op. In the event HUD rejects our offer, you will be called to a general meeting of all members to vote and decide our next step to protect our interest and lifestyle here at Mandalay Shores Apartments."

MSCHA, in spite of a very active and vigorous pursuit of its goal to acquire Mandalay Shores, failed to achieve the same and its offer to purchase the facility was repeatedly turned down by HUD. Its last offer was turned down with finality by February 1980 and by this time it became clear that HUD would not agree to sell the complex to MSCHA under any conditions. This final decision by HUD was formalized by a letter sent by the regional administrator of HUD on February 12, 1980, in which the administrator informed MSCHA that its offer to purchase the complex was rejected with finality. Title to the Mandalay complex was ultimately transferred by HUD to the Bank of Clearwater, as Trustee for benefit of parties unrelated to MSCHA.

It appears from the record that the original bylaws of MSCHA defined a member of the association in "good standing" as one who has paid the association all the assessments and obligations due to date. (Exhibit 2, previously admitted on Motion to Dismiss, Article VIII, Section 2(a)). Obviously, the provision for assessments was drafted to be operative in the event that MSCHA was successful and became the owner of the complex.

The leadership of the Association, upon learning of the final rejection by HUD on February 12, promptly amended the bylaws. The amendment redefined the definition of "members in good standing" by providing that a member in good standing is one who has paid the association all the assessments and all obligations due to date or *"who has not requested and/or received a refund of any deposits or assessments or has not renounced or resigned his (or her or their) membership or is not maintaining any form of action in law or equity or otherwise for refund of any such monies against the Association and/or its officers and/or directors."* (emphasis supplied). It is without dispute that certain members promptly requested a refund in light of the apparent failure of MSCHA to achieve its goal, and some, in fact received a refund. Some of the members who did not immediately filed a lawsuit against MSCHA in the state circuit court seeking a refund in addition to other remedies such as money judgments for damages and punitive damages. The suit was filed in the Circuit Court for Pinellas County, Civil Case No. 79–12720–15, by Marilyn Hosticka Fulton and other disgruntled members. In addition to suing MSCHA, they also sued the principals of MSCHA, asserting that due to MSCHA's failure to return certain deposit monies, interest and assessments paid by the plaintiffs, they are entitled to compensatory and punitive damages and attorneys fees and costs. Although that case is yet unresolved, the plaintiffs were successful in having a receiver appointed in connection with the suit on May 5, 1980.

The board of directors of MSCHA, after learning of the final rejection by HUD, urgently called an emergency meeting of the board to which all members were invit-

ed. At the meeting, counsel for the board informed the membership present what action had been taken by HUD and in response to a query by one of the members, counsel for MSCHA stated that it was his opinion that in light of the fact that the object of MSCHA had completely failed, the Association would not be able to obtain the property; parties who desired to obtain the refund of their contribution could do so. This prompted an avalanche of demands by several tenants who requested in writing a refund of their contributions. The board of directors called a meeting of the board and, later, a special meeting of all the members, however, only "members in good standing" as defined by the newly adopted amendment on February 12th were permitted to attend. At this meeting it was decided by the members in good standing, that is, the group loyal to Mr. Burr, that MSCHA would proceed with litigation in order to force HUD to sell the complex to the membership. MSCHA did, in fact, file several lawsuits against HUD and, as a matter of fact, exhausted all available legal remedies, including an attempt to obtain relief from the Supreme Court of the United States, all of which were without any success. While MSCHA made several attempts to purchase another facility in order to provide housing to members loyal to the management, and, ostensibly, others who care to become members, so far none of these efforts bore fruit and MSCHA still does not own any apartment complex. Mandalay Shores has been owned and operated since 1983 by an unrelated entity who ultimately acquired title to the complex from the Bank of Clearwater.

The plan under consideration placed the members "not in good standing" in Class 4 and offers to those who filed a claim $900 in cash for full settlement of all their possible claims, not only against MSCHA but also against all the defendants named in the Fulton lawsuit which, of course, includes Mr. Burr and also former members of the board of directors. The plan offers to creditors in Class 5, that is the members in good standing, no payment whatsoever but provides that they shall retain their membership in the Association and according to MSCHA this represents the indubitable equivalent of the value of their claim in this proceeding. Some of the members in good standing filed proofs of claim in the proceeding and there is nothing in this record to indicate that they have waived their claims although it is evident that members in good standing are still loyal to Mr. Burr and are fully supportive of the efforts of Mr. Burr and the Association to obtain some housing facility for the members, not necessarily Mandalay Shores, but a comparable facility.

As noted, MSCHA failed to obtain the acceptance of either of these two classes. To overcome the obvious, that is that MSCHA ordinarily could not obtain confirmation of its plan without the affirmative vote of two-thirds in amount and the majority in the number of claimants in any impaired class, see § 1126(c) of the Bankruptcy Code, MSCHA advanced the following contentions in support of its proposition that the plan does not require acceptance by any class within the meaning of the term as defined by § 1124 of the Code, therefore, the plan can be confirmed without any affirmative vote. It is the contention of MSCHA, in support of this proposition, that the creditors placed in Class 4, that is, the former members (members not in good standing), do not have a claim and, therefore, they are not entitled to vote at all and, in any event, even assuming they have a claim, their acceptance is not required because the Debtor is entitled to utilize the cramdown provision of the Code, § 1129(a)(7)(A)(ii) and since they would receive an amount that is not less than they would receive if MSCHA were liquidated under Chapter 7, the plan can be confirmed without their acceptance.

The first contention of MSCHA repeatedly asserted previously and rejected by this Court is based on the Florida Supreme Court decision in *Clearwater Citrus Growers' Assn. v. Andrews,* 81 Fla. 299, 87 So. 903 (1921) in which case the Supreme Court held that members of a business co-op have no right to recover their original contribu-

tion when the co-op was formed. This is merely a restatement of MSCHA's objection to claims of the creditors comprising Class 4. This issue has been fully litigated in this case and this Court has rendered its decision holding that the claimants were creditors and that *Citrus Growers* is not applicable to the facts in this case. *In re Mandalay Shores Cooperative Housing Assn.*, 54 B.R. 632 (Bankr.M.D.Fla.1984). That decision was not appealed and therefore remains the law of the case.

Although the objections were reheard on MSCHA's "Objection to Claims and Alternative Motion of Debtor in Possession for an Order Disallowing Certain Claims and Declaring Certain Other Claims not to be Impaired by Debtor's Modified Plan", this Court is satisfied that the Debtor's reliance on *Citrus Growers* is still misplaced, therefore, this Court declines to retreat from its prior holding. It is clear that *Citrus Growers* was decided upon equitable grounds, i.e. refusing to permit dissatisfied individuals who had voluntarily left the membership in a business co-op to return seven years later to force a dissolution of a functioning business entity.

The instant case is clearly distinguishable in several critical respects. First, *Citrus Growers* involved a cooperative formed for business purposes. MSCHA is not and never was a business entity and never functioned as a business in any sense and the most that could be said is that its only business is endless litigation—an endeavor which was certainly not the purpose for which it was formed. Second, the *Citrus Growers* members invested in a business cooperative which functioned as a legal entity, giving dissatisfied members legal recourse. MSCHA has never been a cooperative as defined by Chapter 719.103(8) Florida Statutes. The monies characterized by MSCHA as "membership fees" were not, in fact, membership fees but were funds which the individuals placed in trust or gave conditionally to achieve a specific goal. That goal was never achieved.

■ Whether viewed as claims for recission for failure of consideration, or on a theory of trust or on a theory of conditional contributions, it is clear that the "former members" comprising Class 4 of the proposed plan are creditors within the meaning of § 101(9) of the Bankruptcy Code and that they have claims within the meaning of § 101(10) of the Code, and there is nothing in § 502 which could compel disallowance of these claims. Since the plan does not propose to pay 100% of the claims, the creditors in this class are entitled to vote and the plan cannot be confirmed without the requisite majority of acceptances in this class unless they are not impaired as a matter of law.

Based on the foregoing, this Court is satisfied that creditors in Class 4 have claims, although unliquidated, which claims are easily capable of estimation if the claims are limited to the amount of funds given to MSCHA. While it is true that several creditors in this class filed for more, it is clear from this record that they have failed to establish that they are entitled to recover more than actually contributed.

■ This leaves for consideration MSCHA's contention that the plan can be confirmed under § 1129(a)(7)(A)(ii). Ordinarily, the analysis under this provision does not present a problem. However, the fact that MSCHA is not subject to a Chapter 7 case conversion absent its consent, not being a monied, business or commercial corporation, § 11 U.S.C. § 303(a) (1984), raises an issue which relates to the comparison of the amount to be paid under a plan to the amount which would be recovered in a Chapter 7 liquidation.

In this connection, it should be noted that MSCHA, very early in its existence, applied for and obtained a tax exempt status as a charitable non-profit corporation pursuant to § 503(c) of the Internal Revenue Code of 1954—26 U.S.C. § 503(c). MSCHA did earn substantial interest income on the funds collected when it was formed, which fund is placed in an interest bearing account. It is without dispute that MSCHA

never filed a tax return and, of course, never paid income tax on the interest earned because of its tax exempt status. According to MSCHA, the plan was structured in this fashion because if MSCHA agreed to refund in full the contribution of the dissenting members in Class 4, this would jeopardize its tax exempt status—which could only be preserved if the provision for creditors in this class represents a compromise and settlement of their claims. Obviously, loss of its tax exempt status would expose MSCHA to a priority tax claim for unpaid income taxes from the date of incorporation, with interest and penalties for failure to file returns of such magnitude that payment to any creditors, including Class 4 creditors, would not be possible because all funds of MSCHA would be exhausted in satisfaction of the IRS priority tax claim.

The plan provides for payment of $900 in "settlement" of the disputed claims and other causes of action held by the claimants in Class 4. Under § 507(a)(6) of the Bankruptcy Code, a claim arising from a pre-petition deposit of money for the purchase of property that was not delivered is entitled to a priority status to the extent of $900. The payments in settlement would not result in the onerous tax consequences that a liquidation would entail. This view is supported on the record by the Opinion Letter of J.E. Griffith, Chief Exempt Organizations Ruling Branch of the Internal Revenue Service. On the other hand, there is serious doubt that in a voluntary Chapter 7 case, if the case is converted by MSCHA, liquidation would permit any payment to any creditors, because of the possible tax priority claim. Clearly, the plan affords to creditors in Class 4 more than they would receive under a Chapter 7 liquidation.

The proposed payment to Class 4, therefore, clearly meets the standard imposed by § 1129(a)(7)(A)(ii). The remaining terms of the settlement, however, present an additional flaw which is fatal to the cramdown theory and consequently to the plan. The terms of the settlement would prohibit the creditors in Class 4 from pursuing specified causes of action against non-debtors.

Unless that provision is eliminated from the plan, it cannot be confirmed because there is no compensation for release of non-debtors. Moreover, due process prohibits confirmation of a plan which deprives the creditors of their right to pursue any action they may have against non-debtors. *Pollgreen v. Morris,* 496 F.Supp. 1042 (S.D.Fla.1980).

This leads to the consideration of whether the plan meets the additional test of § 1129(b)(1) which requires a finding by the court that the plan does not discriminate unfairly and is fair and equitable with respect to each class of claims that is impaired and has not accepted the plan.

The prohibition against unfair discrimination and the requirement that the plan be fair and equitable is defined with reference to unsecured creditors in § 1129(b)(2)(B)(ii) of the Code. That section provides that the plan is not fair and equitable if the holder of a claim or interest that is junior to the claims of the class that is impaired and has not accepted, retains under the plan any property. The creditors in Class 4 and 5, as noted earlier, hold unsecured claims, at least to the extent of their contributions to MSCHA. The plan proposes to pay them less than the allowed value of the claims. The plan also contemplates that MSCHA's interest be recognized and MSCHA will retain, on account of such interest, property, the funds remaining after the plan is consummated. Thus, it is clear that this plan is not fair and equitable and does discriminate unfairly and, therefore, does not meet the test for confirmation under § 1129(b)(1).

It should be noted that a number of the members in good standing also filed claims. The claims are essentially the same as the Class 4 claims and therefore, for the same reasons, the claimants are creditors and the claims are allowed as filed. The claims are impaired under the plan under consideration since those creditors are placed in Class V with the members in good standing, who have not filed claims, and all are

offered nothing but continued membership in MSCHA, an offer of dubious value. The plan could not be confirmed absent affirmative acceptance by the class unless the claims were withdrawn.

The second and more probable result if confirmation of this or a similar amended plan is not obtained, is that the case will be dismissed, denying all of the creditors the equality of treatment for similarly situated creditors that is one of the primary goals of the Bankruptcy Code and the Act which preceded it. Bankruptcy Act of 1898. *Canright v. General Finance Corp.*, 35 F.Supp. 841 (E.D.Ill.1940), *aff'd.* 123 F.2d 98 (7th Cir.1941). In this case it is entirely possible that one lawsuit, *Fulton,* together with the legal and administrative expenses will consume the fund leaving little or nothing for the remainder of the "members" even if these retirees could afford the time and expense of pursuing their claims.

Thus, it appears that since MSCHA is not subject to an involuntary conversion and not willing to voluntarily convert this case to a Chapter 7 liquidation case, the only alternative is dismissal unless MSCHA proposes an amended plan which provides for payment in full of the claims of creditors in Class 4 and 5 to the extent they are allowed, which shall be limited to the amount actually contributed plus interest, and eliminates the requirement that these creditors forego their claims against non-debtors.

Based on the foregoing, it is

ORDERED, ADJUDGED AND DECREED that confirmation of the "Modified Plan for an Arrangement" filed by MSCHA be, and the same hereby, is denied without prejudice. It is further

ORDERED, ADJUDGED AND DECREED that MSCHA shall be given leave to file an amended plan in accordance with the findings herein within 30 days. In the event that an amended plan is not filed and the case has not been voluntarily converted to a Chapter 7 within the time fixed herein, the case shall be dismissed.