**In re Jerry Wayne GILBERT & Loretta Mae Gilbert, Debtors.**

Bankruptcy No. 88–02059–2–11.

United States Bankruptcy Court, W.D. Missouri.

Aug. 3, 1989.

Bruce E. Strauss, Kansas City, Mo., for debtors.

Linda S. Tarpley, Kansas City, Mo., for Jim Stulz.

David DeTar Newbert, Kansas City, Mo., for Farmers Home Admin. & Commodity Credit Corp.

## MEMORANDUM OPINION

FRANK W. KOGER, Bankruptcy Judge.

### FACTS

Before the Court in this Chapter 11 case are a number of issues related to the voting rights of certain members of an unsecured class of creditors under Debtors' proposed plan of reorganization, as well as alleged irregularities attending those votes.

These issues must be resolved before the Court can evaluate the more substantive aspects of the confirmability of Debtors' Plan pursuant to 11 U.S.C. Section 1129. In particular, the Court's resolution of these matters will determine the necessity for examining the Plan's compliance with the "cram down" provisions of Section 1129(b), or more specifically, whether it satisfies the so-called "absolute priority" rule. These latter issues shall not, however, be taken up at this time. As the Court previously indicated, it intends to bifurcate these issues from the questions presented in this dispute.

In January of 1988, this Court dismissed Debtors' original filing under Chapter 12 because Debtors did not qualify under that chapter. Because the amount of Debtors' unsecured debt prevented them from filing under Chapter 13, Debtors thereafter filed the instant Chapter 11 case on May 5, 1988. In dispute are the votes of two members of a four member impaired class of unsecured creditors. This class has been designated in Debtors' Plan as Class X. The two members whose votes are challenged are Christine Gilbert, daughter of Debtors, and Jim Stulz, a business associate of Debtors. The two challenging creditors are Farmers Home Administration (hereinafter "FMHA") and Commodity Credit Corporation (hereinafter "CCC"), both of which are represented by the United States of America through the U.S. Attorney's office. The United States seeks segregation of Christine Gilbert's and Stulz' votes from the other Class X votes for purposes of determining the class' acceptance or rejection of Debtors' Plan. The United States' chief argument is that Christine Gilbert and Stulz are "insiders" within the meaning of 11 U.S.C. Section 101(30)(A) and, consequently, their votes should not be counted for purposes of determining whether Class X is an accepting class under 11 U.S.C. Section 1126(c). In addition to its averment of Stulz' insider status, the United States asserts other reasons why his votes should not be counted towards determining Class X confirmation posture. These attacks include the improper allow-

ance of one vote per claim to a multiple claim holder, an alleged violation of the Code's prohibition against vote solicitation, and the acquisition and exercise of votes for an improper purpose.

Stulz is a creditor of Debtors by virtue of three claims (or arguably two, according to the United States' position) he holds against their estate. One is a secured claim in the amount of $15,000.00, which is the sole claim contained in Class III under Debtors' Plan. The other two are unsecured claims, both of which are in Class X. In addition to Stulz' two claims, Class X contains three other unsecured claims, one each held by FMHA, CCC, and Christine Gilbert. The following is a breakdown of the relevant allowed amounts and voting results for each Class X claimant:

| Creditor | Allowed Amount of Claim | Vote on Debtors' Plan |
|---|---|---|
| 1. FMHA | $140,657.52 | Rejects |
| 2. CCC | $ 13,868.17 | Rejects |
| 3. Stulz | $169,571.00 | Accepts |
| 4. Stulz | $143,020.75 | Accepts |
| 5. Christine Gilbert | $ 2,000.00 | Accepts |
| TOTAL | $469,117.44 | |

The combined amount for the two claims rejecting Debtors' Plan is $154,525.69, while the combined amount for the three claims accepting the Plan is $314,591.75. Stulz purchased the $169,571.00 claim from Citizens Bank & Trust Company (hereinafter "CBT") in December of 1987 for $21,500.00. The claim represents a loan which CBT had purchased from the Federal Deposit Insurance Company as part of a block of other loans. Stulz testified that his primary purpose in purchasing this claim was to assist Debtors towards getting their Plan confirmed. Stulz purchased the $143,020.75 claim from Maple Tree Investment, Inc. (hereinafter "MTI") in March of 1988 for $5,000.00. This transaction was accomplished through a written Assignment of Claim signed by MTI and approved by the Court. The Assignment substituted Stulz for MTI as the owner of the claim. Stulz will receive $4,200.00 on this claim if Debtors' Plan is confirmed.

Stulz testified that his sole purpose in purchasing this claim was to protect his interest in the claim he had purchased from CBT. Stulz originally offered MTI

$3,500.00 for its claim, but MTI declined. Stulz' initial negotiation with MTI occurred in a telephone conversation with an MTI representative. In this conversation, he expressed his hope that MTI would vote in favor of Debtors' Plan if it did not sell the claim. He explained to MTI that given his position as Debtors' largest unsecured creditor, it was in his best interest to get the Plan confirmed. MTI responded with a counteroffer in which they indicated that they had not made a decision as to how they would vote on the Plan. These negotiations took place approximately four months prior to the filing of Debtors' Plan and the Court's approval of Debtors' Disclosure Statement. Subsequent to Stulz' telephone conversation with MTI, MTI made Stulz a written counteroffer of $5,000.00 for the claim, indicating that MTI had not made a decision as to whether they would vote to accept Debtors' Plan.

The United States argues that Stulz' insider status stems from his business association with Jerry Gilbert in an entity by the name of Ag Management International (hereinafter "AMI"). AMI is a financial consulting operation which serves as an advocate and advisor for financially distressed farmers. Stulz and Jerry Gilbert are the sole general partners of AMI. Through Stulz, AMI has periodically advised Debtors in matters related to their bankruptcy and has attended hearings in this Court on behalf of Debtors. Stulz also assisted Debtors to a limited extent in composing their reorganization plan. As to Christine Gilbert, the United States claims that as daughter of Debtors, she is an insider as that term is defined under 11 U.S.C. Section 101(30)(A)(i).

Also pertinent to this discussion is Class III under Debtors' Plan. The sole claimant in Class III is Metropolitan Life Insurance Company (hereinafter "Metropolitan"). Class III is an impaired class that has affirmatively accepted Debtors' Plan.

## QUESTIONS PRESENTED

1. Whether an individual creditor is an "insider" for purposes of plan confirmation

where that creditor and the individual debtor are general partners in a nonbankrupt entity which is not a creditor of the debtor's bankruptcy estate.

2. Whether one entity holding two or more disparate claims is entitled to vote them separately within that entity's class for purposes of determining under 11 U.S.C. Section 1126(c) whether the class has accepted or rejected the plan.

3. If one impaired noninsider class has accepted the plan, thereby meeting the requirement of 11 U.S.C. Section 1129(a)(10), should the acceptance of any remaining impaired classes be determined under 11 U.S.C. Section 1126(c) with the inclusion of insider acceptances in such classes?

4. Whether the communications between Stulz and Maple Tree Investment Company constituted an impermissible "solicitation" within the meaning of 11 U.S.C. Section 1125(b).

5. Whether Stulz' purchase of two unsecured claims at a discount to gain a class majority acceptance vote was for an improper motive and violative of 11 U.S.C. Section 1126(e).

## DISCUSSION

### I. *Insider Status*

 The United States claims that Christine Gilbert and Stulz are insiders within the meaning of Section 101(30)(A). Debtors' counsel has not expressly denied this assertion, nor has he definitively conceded it. A determination of this issue does not, as it turns out, alter the outcome of the Court's ultimate decision in this matter. Nevertheless, the United States has raised the issue and Court anticipates that it has the potential to impact future confirmation issues in this case. Section 101(30)(A) provides that if the debtor is an individual, an "insider" includes a:

(i) relative of the debtor or of a general partner of the debtor;

(ii) partnership in which the debtor is a general partner;

(iii) general partner of the debtor;

No analysis is necessary to conclude that Christine Gilbert is an insider. As a daughter of Debtors, she fits precisely one of the enumerated descriptions of an insider. Section 101(30)(A)(i); *see, In re Atkinson*, 78 B.R. 449, 450–51 (Bankr.D.S.C. 1987) (debtor's brother was insider under this code section). Greater reflection is required of the Court, however, as to the insider status of Stulz because his relationship with Debtors does not neatly fit one of the statutory prototypes. Section 101(30)(A)(ii) refers to partnerships in which the debtor is a general partner. This section is inapplicable since the question is whether Stulz, as a general partner of AMI, and not AMI, is an insider. While Stulz and Jerry Gilbert are general partners of one another in AMI, Stulz is not a general partner *of Debtors* such that he has a partnership interest in their bankruptcy estate. Thus, Section 101(30)(A)(iii) also does not apply. The analysis does not end so easily, however, simply because this relationship does not concisely conform to any of the formal relationships described in the Code.

As Section 101(30)(A) suggests, illustrations shape the meaning of "insider". The Code's use of the word "includes" is intended to denote a general class for which the statute provides a nonexhaustive list of members. As 11 U.S.C. Section 102(3) makes clear, the terms "include" and "including" are not limiting. The legislative history accompanying the statutory definition of insider states that "[a]n insider is one who has a *sufficiently close relationship* with the debtor that his conduct is made subject to closer scrutiny than those dealing at *arms length* with the debtor." H.R.Rep. No. 95–595, 95th Cong., 2d Sess. 312 (1977), U.S.Code Cong. & Admin.News 1978, p. 6269; S.Rep. No. 95–989, 95th Cong., 2d Sess. 25 (1978), U.S.Code Cong. & Admin.News 1978, pp. 5787, 5810 (emphasis added). An insider may, therefore, be a person or entity other than those enumerated in Section 101(30), provided the particular relationship meets these guidelines. *In re Poage*, 92 B.R. 659, 665 (Bankr.N.D.Tex. 1988); *Matter of Kucharek*, 79 B.R. 393, 395 (Bankr.E.D.Wis.1987). In such cases,

contemporary insider analysis invites the Court to consider whether the disputed relationship is similar to or bears characteristics of any of the relationships specified in the statute. *In re Henderson*, 96 B.R. 820, 825 (Bankr.E.D.Tenn.1989). Often considered by most courts as the controlling considerations are the closeness of the parties and the relative degree of control each has over the other. *Id.* In addition, the Court's determination as to insider status should be guided, in part, by the statutory context in which the word is used in order that it advances the particular statute's intended objectives.

Most of the insider status litigation occurs in the context of preferential transfers. The focus in these cases is whether the creditor's relationship with the debtor places the creditor in a position to influence or *control the debtor's actions* such that the interests of other creditors are frustrated. *See, e.g., In re F & S Central Mfg. Corp.*, 53 B.R. 842, 848 (Bankr.E.D.N.Y. 1985) (creditor's special relationship with debtor through which creditor could compel payment and manipulate timing of bankruptcy was sufficient control to deem creditor an insider). Protecting the interests of other creditors also seems to be the driving force behind the preclusion of insiders of an impaired class from voting on a reorganization plan under Section 1129(a)(10). The focus in measuring the relative control in this context, however, is not necessarily on the extent of a creditor's control over the debtor. A disproportionate amount of control held by either the debtor or a creditor over the other could support the exclusion or invalidation of a creditor's vote on the basis of insider status. It is not difficult to envision, for example, a secured creditor in a single asset case who, given the size and nature of its claim, could dominate virtually every aspect of the debtor's reorganization, particularly the treatment of junior lienholders. The Court believes though that the primary objective of Section 1129(a)(10)'s insider component is to forestall the voting of a creditor who is so beholden to or controlled by the debtor as to in effect be an alter ego of the debtor. *Compare, In re Blesi*, 43 B.R. 45, 48

(Bankr.D.Minn.1984) (stating that this is the aim of the insider exclusion for purposes of trustee elections under Section 702(a)). The exclusion recognizes that where a creditor is under the debtor's proverbial thumb due to the parties' affinity of interests, that creditor is less likely, perhaps even incapable, of casting a vote formed on an independent judgment of what will best serve his interests, much less those of his fellow class members.

The Court's function then, given the current development of the law, is to determine whether Stulz' relationship with Jerry Gilbert is one that implicitly belongs among the general class of insiders sketched out by the Code. The United States relies upon two insider definitions in asserting Stulz' insider status. One is Section 101(30)(A)(ii), which defines an insider as a partnership in which the debtor is a general partner, and the other is Section 101(30)(A)(iii), which defines the term as one who is a general partner of the debtor. Armed with these definitions, the United States' argument that Stulz is an insider because he and Jerry Gilbert are general partners in AMI has a powerful siren-like effect analogous to the one known in Greek mythology where the singing of certain female creatures lured mariners to their destruction. Admittedly, it does not seem to be much of a stretch, analytically, to reason that if a debtor's interest as a general partner in a creditor-partnership can render the partnership an insider, his debtor-creditor relationship with a fellow general partner in a noncreditor partnership should also qualify the general partner as an insider. The Court refuses under the instant facts, however, to succumb to this facially appealing argument. Whether a person qualifies as an insider is a question of fact which must be determined on a case-by-case basis. *In re Henderson*, 96 B.R. at 825.

The facts of this case do not support a conclusion that Stulz' relationship with Jerry Gilbert is such that either is capable of exercising undue influence over the other. Stulz' activities as an advisor to Debtors in their bankruptcy and other business affairs

do not reveal transactions or dealings that were impermissibly shorter than arms length. *See In re Lemanski,* 56 B.R. 981, 983 (Bankr.W.D.Wis.1986) (debtors' attorney not an insider for purposes of Section 547, provided dealings are arms length). While the evidence indicates a close relationship between Stulz and Gilbert, it does not portray Stulz as a creditor who is so beholden to or controlled by Debtors as to in effect be their alter ego. The irrefuted evidence adduced at trial demonstrated that his relationship and transactions with Debtors were at all times on a sufficiently independent footing. There is also no indication that Stulz' Class X voting was improperly motivated by any undue influence exerted by Debtors nor any intolerable bias on Stulz' part that would fairly bring him under Code's current insider population. Given the Court's determination that Stulz is not a insider, his vote may be included for purposes of the confirmation requirement of Section 1129(a)(10). The Court wishes to emphasize that while it does not find this particular relationship embraced by the presently developed examples of an insider, the same relationship under a different set of facts could fit the definition.

## II. *Voting Rights of One Creditor Holding Multiple Claims*

■ The next item requiring the Court's attention is the issue of how many votes Stulz is entitled to as a noninsider member of Class X. The Court agrees with the United States' observation that the status of a creditor's right to vote is determined at the time the vote is taken, not at the time the debt arises. *In re Featherworks,* 36 B.R. 460, 464 (D.E.D.N.Y.1984), *aff'g* 25 B.R. 634, 639–40 (Bankr.E.D.N.Y.1982). The United States concedes that the total amount presently claimed by Stulz' has its origin in two separate underlying claims. In spite of this concession, the United States insists that Stulz is only

entitled to one vote because, at the time of the vote, these two claims were no longer held by two separate payees, but were held by Stulz alone.

The Code does not underwrite such magic. The formula contained in Section 1126(c) [1] speaks in terms of the *number of claims,* not the number of creditors, that actually vote for or against the plan. *In re Jeppson,* 66 B.R. 269, 294 (Bankr.D.Utah 1986); *see also, In re Jartran,* 44 B.R. 331, 364 (Bankr.N.D.Ill.1984) (referring to number of ballots received based on the "amount of claims voted"). The separateness of Stulz' two claims and his entitlement to two votes is not the result of any legal fiction or product of some form of bifurcation as the United States suggests. Each claim arose out of a separate transaction, evidencing separate obligations for which separate proofs of claim were filed. Votes of acceptance, such as those cast by Stulz, are to be computed only on the basis of filed and allowed proofs of claim. *Avery v. Fischer,* 360 F.2d 719, 725 (5th Cir.1966) (citing 6 Collier on Bankruptcy 7.36, p. 2099 (14th ed. 1964)). Section 101(4) defines a "claim" as a *"right to payment".* Stulz acquired two distinct rights to payment through two separate and unrelated arms length transactions. Further, Debtors' Plan contemplated two separate claims before Stulz paid consideration and took assignment of MTI's unsecured claim. Stulz is entitled to one vote for each of his unsecured Class X claims.

## III. *Relationship Between 1129(a)(10) and 1126(c) For Purposes of Insider Voting and Class Acceptance*

Among the requirements that a reorganization plan must meet before it can be confirmed is the one impaired class acceptance requirement of 11 U.S.C. Section 1129(a)(10) which provides that:

> If a class of claims is impaired under the plan, *at least one class of claims that is*
>
> *of the allowed claims of such class* held by creditors, other than any entity designated under subsection (e) of this section, that have accepted or rejected such plan.
> (emphasis added).

---

1. Section 1126(c) provides:
 A class of claims has accepted a plan if such plan has been accepted by creditors, other than any entity designated under subsection (e) of this section, that hold at least two-thirds in amount and more than one-half in *number*

*impaired* under the plan has accepted the plan determined without including any acceptance of the plan by any insider.

(emphasis added).

Much of counsels' arguments on this issue have centered around the vitality, interpretation, and relevance of *In re Landau Boat*, 13 B.R. 788 (Bankr.W.D.Mo.1981). This Court's reading of its predecessor's decision in *Landau Boat*, as it relates to the Code's confirmation requirement of Section 1129(a)(10), permits only one conclusion—*Landau Boat* would come out differently under the current language of Section 1129(a)(10), but the case is wholly inapposite to the case at bar. The pertinent issue in *Landau Boat* was whether Section 1129(a)(10) required that a noninsider class accept "affirmatively" before a plan could be confirmed. Judge Pelofsky determined that with respect to unimpaired claimants, "deemed acceptance" was sufficient, noting that if Congress had intended an affirmative acceptance requirement, it would have provided for it. *Id.* at 790. *Landau Boat* was decided prior to the Bankruptcy Amendments and Federal Judgeship Act of 1984 (hereinafter the "Amendment"). Before the Amendment, Section 1129(a)(10) required that "*[a]t least one class of claims* has accepted the plan, determined without including any acceptance of the plan by any insider holding a claim of such class." The sole effect of the Amendment was to permit confirmation of a plan if the debtor obtains the affirmative vote of at least *one impaired class*, unlike the former provision which required acceptance of *any one class*, whether or not its members were impaired. *Matter of Mandalay Shores Co-op Housing Ass'n*, 53 B.R. 609, 610 (Bankr.M.D.Fla.1985).

In its brief, the United States quotes excerpted language from *Landau Boat*, which, paraphrased, states that in making the Section 1126(c) calculation to determine whether a class has accepted the plan for purposes of the Section 1129(a)(10) confir-

mation requirement, the court must disregard the votes of insiders. *Id.* The court found this requirement met since there was *a class* who was "deemed" to have accepted by virtue of the unimpaired status of four of its members who, together, satisfied the voting thresholds of Section 1126(c). *See also, In re Jartran, Inc.*, 44 B.R. 331, 396 (Bankr.N.D.Ill.1984) (pre-Amendment decision found this provision could be met whether acceptance was by impaired or unimpaired class). One rejecting, but no accepting impaired class existed in *Landau Boat*. Consequently, its result would necessarily be different under the current language of Section 1129(a)(10). More importantly, however, *Landau Boat* did not address the question of whether insider votes of an impaired class are to be disregarded in Section 1126(c) calculations once the Court has determined that at least one other impaired noninsider class has accepted the plan in satisfaction of the confirmation requirement of Section 1129(a)(10). This presents a question novel to this district.

 The Court, and Debtors' counsel, could find only one reported post-Amendment case on all fours with this issue.[2] In the case of *In re Grimes Furniture, Inc.*, 47 B.R. 68 (Bankr.W.D.Penn.1985) the court held upon the debtors motion for reconsideration that "insider votes of an impaired class cast in favor of a plan may be counted under Section 1129(a)(10) when there exists at least one other accepting impaired class which contains no insiders." *Id.* at 70. After a considered analysis of the relevant Code sections, their legislative history, and related case law, this Court finds the *Grimes* holding correct and, accordingly, adopts that holding.

In parsing the relationship between Section 1129(a)(10) and Section 1126(c), the Court's initial attention is briefly drawn to the simple fact that the former section appears under the heading of "Confirmation of Plan", while the latter section appears under the heading of "Acceptance of

---

**2.** This is not surprising given the relatively short amount of time that the amended language of

1129(a)(10) has been in effect.

Plan". While the Court does not endorse the use of statutory headings as a reliable means of statutory construction, such observations can be helpful as merely one bit of information in construing a statute's whole meaning. *Compare, In re Leva,* 96 B.R. 723, 725 (Bankr.W.D.Tex.1989) (in construing state's exemption statutes, court utilized Texas' statutorily authorized canons of construction, one of which is statute's title or caption). The titles of the above two statutes suggests that these two provisions serve two distinct purposes, to wit: the first is a test of confirmation, while the second is the mechanism by which the Court determines whether a given class has accepted a proposed plan. The language of these two provisions vindicates this titular observation. Nowhere in Section 1126(c) is there any reference to an exclusion of insiders for purposes of determining whether a class is an accepting class. Such an exclusion only appears in the amended language of Section 1129(a)(10) which operates exclusively as a confirmation hurdle. Under this section, only one impaired noninsider class need vote to accept a plan for purposes of confirmation under Section 1129(a) or (b). *In re Ruti–Sweetwater, Inc.,* 836 F.2d 1263, 1267 (10th Cir.1988); *Matter of 47th and Belleview Partners,* 95 B.R. 117, 120–21 (Bankr. W.D.Mo.1988); *In re Martin,* 66 B.R. 921, 924 (Bankr.D.Mont.1986). Further, once a single impaired class of noninsiders has accepted a plan, a plan may be "crammed down" over the objections of every other class of creditors pursuant to Section 1129(b). *In re Ruti–Sweetwater, Inc.,* 836 F.2d at 1267.

Further support for the Court's construction of the relationship between Section 1126(c) and Section 1129(a)(10) is found within the other confirmation provisions that refer to the acceptance of an impaired class. The confirmation prerequisite of Section 1129(a)(7)(A) requires that each member of an impaired class either accept the plan or receive or retain under the plan property of a value that is not less than what that claimholder would receive if the debtor were liquidated under Chapter 7. Section 1129(a)(8) requires for a noncram-down confirmation that every impaired class accept the plan. As the Court stands back and surveys the codal structure relevant to this issue, reference to a maxim of statutory construction—*expressio unius est exclusio alterius*—is useful. The import of this canon is that if a statute specifies certain exceptions to the general application, other exceptions are excluded and are not to be implied absent evidence of a contrary legislative intent. *In re Mueller,* 71 B.R. 165, 168 (D.Kan.1987) (citing *Adrus v. Glover Construction Co.,* 446 U.S. 608, 100 S.Ct. 1905, 1910, 64 L.Ed.2d 548 (1980)); *Liberty National Bank & Trust Co. v. George,* 70 B.R. 312, 315 (D.W.D.Ky.1987). The fact that the Court is construing the interaction of more than one statute makes for a stronger application of this maxim which is typically used in the context of a single statute that contains stated exceptions. The voting formula of Section 1126(c) contains *no exceptions.* To gain confirmation, Section 1129(a)(10) requires the acceptance of at least one impaired noninsider class. If it so happens that more than one exists, that occurs by coincidence, and not by the Court affirmatively excepting insider votes from those classes. The Code does not contain an expression of such a mandate and in the absence of a scintilla of legislative history to support one, the Court refuses to imply one. Further, none of other confirmation provisions addressing the requirements of impaired classes creates any exceptions as to insiders.

Accordingly, the vote of Christine Gilbert may be included in determining whether Class X is an accepting class. According to the balloting report filed, the inclusion in Class X of Ms. Gilbert's and Stulz' votes as authorized by the Court's findings herein makes Class X an accepting class. Section 1129(a)(8) is, therefore, satisfied as this leaves no impaired class rejecting Debtors' Plan. The Court is keenly aware that permitting the inclusion of insider acceptances will render, as it has in this case, an otherwise rejecting class an "accepting class", thereby taking such class out of the fair and equitable provisions of Section 1129(b).

This does not leave the noninsider claimants of an impaired class without any protection under a confirmable plan. The plan must still meet the liquidation test of Section 1129(a)(7). In addition, the dual voting thresholds of Section 1126(c) must be met. Finally, if an insider's vote is cast or solicited in bad faith, it may be invalidated under Section 1126(e). This is all the sanctuary Congress provided for such claimants and if more is needed, then it is for Congress and not this Court to legislate it.

## IV. *Prohibited Solicitations Under Section 1125(b)*

■ The United States questions the reasonableness of Stulz' alleged solicitation of MTI's vote approximately four months prior to the Court's approval of Debtors' Plan and Disclosure Statement. While the point of this accusation is not clearly expressed, the Court can only take it to mean that Stulz' telephone conversation with MTI in October of 1988 was a violation of the Code's prohibition against vote solicitation. Consequently, the United States seeks the Court invalidation of the vote representing this claim. The Code sections relevant to this claim are Section 1125(b) and Section 1126(e). Section 1125(b), in pertinent part, provides:

> An acceptance or rejection of a plan may not be solicited after the commencement of the case under this title from a holder of a claim or interest with respect to such claim or interest, unless, at the time of or before such solicitation, there is transmitted to such holder the plan or summary of the plan, and a written disclosure statement approved, after notice and hearing, by the court as containing adequate information [3]....

Section 1126(e) provides:

> On request of a party in interest, and after notice and a hearing, the court may

designate any entity whose acceptance or rejection of such plan was not in good faith, or was not solicited or procured in good faith or in accordance with the provisions of this title.

Whether a communication is a "solicitation" and violates Section 1125(b) is a matter of fact and law, and the section provides for no specific penalty. Section 1126(e), on the other hand, proscribes a broader range of communications, specifically allowing the court to designate a vote for *any conduct* that defiled the voting process, whether it violates a specific provision or is in "bad faith." *Century Glove, Inc. v. First American Bank of New York,* 860 F.2d 94, 97 (3d Cir.1988).

The Code does not define the term "solicited." The term must nevertheless be very narrowly interpreted to mean only specific requests for an official vote for or against the reorganization plan. *In re Snyder,* 51 B.R. 432, 436–37 (Bankr.D.Utah 1985). The term should not encompass free and honest negotiations among creditors over a tentative plan because such a broad definition would inhibit their meaningful participation in the debtor's reorganization. *Century Glove, Inc.,* 860 F.2d at 100–01. This is particularly true of oral communications between creditors and other interested parties. *In re Gulph Woods Corp.,* 83 B.R. 339, 342 (Bankr.E.D.Pa.1988). The bankruptcy court's regulation of such oral communications would create unwarranted delays in the confirmation process at the expense of virtually everyone concerned. As for making a distinction between permissible negotiations and prohibited solicitations, this Court favors the view of the Third Circuit that there is no principled or predictable difference, and that any definition would tend to chill creditors' negotiations. *Century Glove, Inc.,* 860 F.2d at 101–02.

---

**3.** "Adequate information" is defined under 1125(a)(1) to mean:

> [I]nformation of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, that would enable a hypothetical reasonable investor typical of holders of claims

or interests of the relevant class to make an informed judgment about the plan ...

The "reasonable investor" typical of its class include those, in particular, who have the "ability to obtain such information from sources other than the disclosure required by this section as holders of claims or interests in such class generally have." 1125(a)(2)(C).

Based on Stulz' own testimony, the Court has little choice but to find that an untimely "solicitation", albeit oral, occurred during the course of his communications with MTI in violation of Section 1125(b). In expressing his "hope" that MTI would vote for Debtors' Plan, Stulz', for all practical purposes, made a specific request for MTI's vote in technical violation of Section 1125(b). For a number of reasons, however, the Court finds that this "solicitation" does not warrant the imposition of sanctions under either Section 1125(b) or Section 1126(e). This determination is necessarily fact-specific in view of the delicate balance this Court is charged with striking between first amendment principles and the purposes of Section 1125(b) and Section 1126(c). *In re Gulph Woods Corp.*, 83 B.R. at 343.

First of all, there is nothing about Stulz' conduct to suggest bad faith on his part. Factors that might signal bad faith include a transmission during the voting period of materials clearly presented as a solicitation that contain falsehoods or mischaracterizations, or any form of communication that tends to confuse or distort the voting process. *Id.* at 342–43. The demonstrated purpose of Stulz' conversation with MTI was to purchase MTI's claim in order to protect his other unsecured claim. In his "solicitation" of MTI's future support for Debtors' Plan, Stulz did not, for example, attempt to sell or even suggest an unfiled alternative plan that was not backed up by adequate disclosure. *See, e.g., In re Media Central, Inc.*, 89 B.R. 685, 689 (Bankr.E.D. Tenn.1988) (unapproved document that requested support for two alternative unfiled plans and which contained disclosure statement type information violated Section 1125(b)); *In re Temple Retirement Community, Inc.*, 80 B.R. 367, 369 (Bankr.W.D. Tex.1987) (suggestion of alternative plan without approved full disclosure was impermissible). Second, the Stulz–MTI communications took place long before the balloting period. *See, In re Gulph Woods Corp.*, 83 B.R. at 342 (communication during voting period is factor suggesting un-

fair influence on voting). Thus, MTI was not under any temporal pressure to make a voting decision or, alternatively, to sell its claim to Stulz. This fact is evidenced by its subsequent letter to Stulz in which MTI made a counteroffer and indicated that it had not made a decision on whether to vote for Debtors' Plan. These circumstances point up at least two important features of the confirmation process that limit the potential for harm from such untimely technical solicitations. First is the requirement that a creditor receive adequate information before casting its final vote, giving it a chance to reconsider any preliminary decision. The second limitation is that until they cast their votes, creditors may engage in free and open negotiations. *Century Glove, Inc.*, 860 F.2d at 102. Finally, the evidence shows that MTI was sufficiently sophisticated and resourceful to protect the interest it then had in Debtors' bankruptcy from any untoward advances by other creditors.

V. *Purchasing Claims to Procure Votes and Section 1126(e)*

■ The Court has been asked to consider whether the vote Stulz purchased from MTI should be invalidated under Section 1126(e) on the grounds that it was procured for an improper purpose. This debate arguably overlaps with the issue of solicitation, but the Court chooses to dignify the issue with a separate discussion in the interest of clarity. What sets these two discussions apart is the focus of the Court's inquiry. While the solicitation question turned on Stulz' conduct relative to his communications with MTI, the focus here is on his *motive* for purchasing and voting MTI's claim.

The issue is "good faith" which is left undefined under the Code. The United States Supreme Court set the standard for good faith in *Young v. Higbee Co.*, 324 U.S. 204, 210–11, 65 S.Ct. 594, 597–98, 89 L.Ed. 890 (1945) under the predecessor of Section 1126(e),[4] stating that the purpose of the good faith provision was to prevent creditors from using "obstructive tactics and

---

**4.** Section 203 of Chapter X of the Bankruptcy Act, 11 U.S.C. § 603.

holdup techniques" to secure either some unfair advantage through the plan's acceptance or rejection, or perhaps preferential treatment for the price of their vote. The difficulty in distilling bad faith from a given set of facts is that good faith and self dealing are not mutually exclusive. *In re Featherworks Corp.*, 36 B.R. 460, 462 (E.D.N.Y.1984). Good faith voting does not require, nor can it expect, a creditor to act with selfless disinterest. *In re Federal Support Co.*, 859 F.2d 17, 19 (4th Cir.1988). The test then, consonant with the United States Supreme Court's standard, is whether a creditor has cast his vote with an "ulterior purpose" aimed at gaining some advantage to which he would not otherwise be entitled in his position. *In re A.D.W., Inc.*, 90 B.R. 645, 649 (Bankr.D.N.J.1988); *In re MacLeod Co., Inc.*, 63 B.R. 654, 655 (Bankr.S.D.Ohio 1986). Ulterior or coercive motives that have been held to constitute bad faith include "pure malice, 'strikes', blackmail, and the purpose to destroy an enterprise in order to advance the interests of a competing business." *In re Federal Support Co.*, 859 F.2d at 19 (citing *In re Pine Hill Collieries, Co.*, 46 F.Supp. 669, 671 (E.D.Pa.1942).

To customize this general template of "bad faith" to a situation like the one before the Court where creditors' interests are purchased for the purpose of securing approval of a plan, the following reasoning of the Second Circuit is useful:

> The mere fact that a purchase of creditors' interests is for the purpose of securing the approval or rejection of a plan does not of itself amount to "bad faith". When that purchase is in aid of an interest other than an interest as a creditor, such purchases may amount to "bad faith" under section 203 of the Bankruptcy Act [the predecessor to Section 1126(e)]. (citation omitted). And certainly there is "bad faith" when those purchases result in discrimination in favor of the creditors selling their interests.

*In re P–R Holding Corp.*, 147 F.2d 895, 897 (2d Cir.1945); *see also In re MacLeod Co., Inc.*, 63 B.R. at 655 *and In re Featherworks Corp.*, 36 B.R. at 463 (both citing this language with approval). The purchase of claims for an improper purpose has been held to occur, for example, where such claims were marketed and purchased to manipulate other creditors' interests. *See In re Kuhns*, 101 B.R. 243 (Bankr.D. Mont.1989) (debtor financed insider's purchase of claims for purpose of controlling litigation against debtor through insider's membership on unsecured creditors committee).

An evaluation of the facts of this case under the foregoing standards indicates that Stulz' purchase and subsequent vote of MTI's claim were not inspired by a prohibited ulterior purpose. He did not approach MTI with the hope of cultivating a market for his other unsecured claim. Nor is there evidence that he cast the purchased MTI vote to manipulate other creditors or to coerce Debtors into paying him more than his fair ratable share of Debtors' estate. And there is no evidence suggesting that his votes were acquired to destroy an enterprise of other Class X members, much less Debtors, in order to advance his interests in a competing business. Stulz' testimony was that the sole purpose behind his purchase and subsequent vote of the MTI claim was to protect his other claims against Debtors' estate. This testimony was, in fact, elicited at trial on several occasions by the United States during its cross-examination of Stulz, and remains uncontroverted. A cursory look at the relevant circumstances corroborates Stulz' testimony. Part of his self-interest lies in protecting his $15,000.00 claim classified in Class VIII. As Debtors point out in their brief, the transactional costs associated with a straight liquidation of Debtors would necessarily cause Stulz in that event to receive less for this claim than under Debtors' Plan. Stulz' purchase of the MTI claim to gain the needed Class X vote was also designed to insure greater recovery on his other unsecured claim of $169,571.00. Where a creditor sufficiently manifests such motivations, the Court will not hazard to second-guess the wisdom of that creditor's business judgment as displayed by his voting decision. Even if Stulz' projected

recovery proves to be too low and he actually recovers more for his claims, they are his claims to vote and the good faith he exhibited then will not be subjected to a subsequent examination with the benefit of hindsight. As long as a creditor acts to preserve what he reasonably perceives as his fair share of the debtor's estate, bad faith will not be attributed to his purchase of claims to control a class vote. *See In re Federal Support Co.*, 859 F.2d at 19 (coercive voting to exact more is an improper purpose). Stulz purchased and voted his claims in this spirit and, therefore, his Class X votes are to be counted.

## CONCLUSION

Based on the Court's examination of the evidence under the foregoing analysis it, makes the following findings of fact and conclusions of law:

1. Christine Gilbert is an insider as a matter of law pursuant to Section 101(30)(A)(i). Stulz is not an insider within the meaning of Section 101(30)(A)(ii) or (iii).

2. Stulz is entitled to one vote for each unsecured Class X claim he holds pursuant to Section 1126(c).

3. Because there exists in Class III under Debtors' Plan one accepting impaired noninsider class, the confirmation requirement of Section 1129(a)(10) is satisfied. As a result, the insider vote of Christine Gilbert may be included in counting the acceptance votes of the impaired Class X for purposes of Section 1126(c). The United States' motion to segregate the votes of Stulz and Christine Gilbert from Class X is DENIED.

4. While the communications between Stulz and MTI constitute a technical violation of the solicitation prohibition of Section 1125(b), no sanction is warranted on the evidence under either Section 1125(b) or Section 1126(e). The United State's motion to disallow his Class X votes on these grounds is, therefore, DENIED.

5. Stulz' purchase of MTI's claim to gain control of Class X's vote to accept Debtors' Plan was in good faith. The United State's motion to disallow this Class X

vote on these grounds is, therefore, DENIED.

SO ORDERED.

The foregoing Memorandum Opinion constitutes Findings of Fact and Conclusions of Law as required under Rule 7052, Rules of Bankruptcy.