In re HILLSIDE PARK APTS.,
L.P., Debtor.

Bankruptcy No. 96–43486.

United States Bankruptcy Court,
W.D. Missouri.

Feb. 10, 1997.

Scott J. Goldstein, Kansas City, MO, for Multi–Family Mortgage Trust.

Ronald S. Weiss, Kansas City, MO, for Hillside Park Apts., L.P.

## MEMORANDUM ORDER

FRANK W. KOGER, Chief Judge.

This matter is before the Court on the objection filed by Multi–Family Mortgage Trust 1996–1 ("Multi–Family") to the disclosure statement filed by the debtor Hillside Park Apts., L.P. ("Hillside"). For the following reasons, the Court sustains Multi–Family's objection.

### Factual Background

Hillside and five other related partnerships[1] each own and operate a respective apartment complex in different cities located in Texas, Louisiana, Georgia, and Missouri. Hillside owns and operates Hillside Park Apartments in Kansas City, Missouri. Hillside and the five other partnerships each had placed the financing note on its respective property with various lenders prior to 1982. Each of the partnerships, including Hillside, defaulted on their respective loans and each loan was assigned to the U.S. Secretary of Housing and Urban Development ("HUD"). According to Hillside, in early 1995, HUD began to sell large portfolios of defaulted mortgage notes secured by multi-family housing units to non-governmental private parties. HUD remained in possession of all of the Hillside and related notes until June, 1996, when it assigned, as part of a large portfolio of other properties,[2] all six of the notes to Multi–Family [c/o JER HUD Management, Inc.]. Multi–Family in turn assigned the notes relating to four of the other related partnership properties to various affiliated companies. Multi–Family kept the

notes relating to Hillside and one of the other five properties and still holds the notes on those two.

Hillside has alleged that shortly after acquiring the notes, the JER Group began to prepare and file court proceedings and foreclosures against Hillside and the other related partnerships which were calculated by the JER Group to have the maximum adverse effect on Hillside and the related partnerships. According to Hillside, the JER Group told it and the related partnerships that all of the foreclosure actions had been filed and would result in foreclosures on the properties in the first week of August, 1996, unless each of the affected related partnerships paid to its respective JER Group affiliate a sum of money which the partnerships felt was greater than the fair market value of each respective property. Because of the threatened foreclosures, on August 5, 1996, one of the related partnerships ("Georgetown") filed bankruptcy in the Western District of Louisiana, the proper venue for that partnership. All of the rest of the related partnerships, including Hillside, filed "affiliated" cases in the same Louisiana court. Hillside filed its bankruptcy case on August 5, 1996. On August 20, 1996, the JER Group filed motions to dismiss or transfer venue in all of the cases except the Georgetown case. The Louisiana bankruptcy court granted the motions to transfer venue and transferred each case, except the Georgetown case, to their respective proper venues. The Hillside case was transferred to this Court. Hillside maintains these transfers were improper and will result in increased costs to it as well as impairing its ability to resist the hostile takeover of its property (as well as the other partnerships) by the JER Group. All of the other cases are still pending in their respective venues.

In Hillside's particular case, Hillside executed a deed of trust note dated April 20, 1982, in the original principal amount of $3,232,000.00 payable to the order of Banco Mortgage Company. The deed of trust was secured by liens and security interests in

---

1. The general partner of Hillside, Sunset Downs Corp., is also the general partner of four of the other related partnerships, and is the ordinary partner of the fifth.

2. According to Hillside, a group of lenders with which Multi–Family is affiliated, denominated by Hillside as the "JER Group," acquired as many as 158 notes from HUD.

both real and personal property, including the Hillside Park Apartments located in Kansas City, Missouri. The original note and deed of trust were non-recourse as to the Hillside partnership.[3] In 1992 Banco Mortgage Company assigned the note to HUD as a result of an alleged financial default by Hillside. On June 27, 1996, HUD assigned the note to Multi–Family and on July 11, 1996, Hillside was notified of the assignment. At that time, Multi–Family and/or the JER Group demanded payment in full on the note after which Hillside, along with the other related partnerships, filed bankruptcy.

In its schedules filed on September 4, 1996, Hillside listed the value of the apartment complex at $2,899,480.00 and listed Multi–Family as a secured creditor with a disputed claim in the total amount of $3,232,000.00. In its disclosure statement filed on November 1, 1996, Hillside valued the apartment complex at $2,500,000.00 and estimated the balance due Multi–Family on the note to be $3,944,918.00. Multi–Family claims that the property was recently appraised for $2,725,000.00 and that the total debt as of August 5, 1996, was $3,818,387.90. Although Hillside and Multi–Family disagree as to the value of the property and the remaining amount due on the debt, both parties agree that Multi–Family is an undersecured creditor. Multi–Family has made it clear that it will not elect nor accept treatment as a secured creditor under section 1111(b) of the Bankruptcy Code and that it will assert both the secured and unsecured portions of its claim.

In its schedules, Hillside also listed Grand Court Lifestyles, Inc. (Grand Court) as a secured creditor with a claim in the amount of $12,500.00. The officers and directors of Grand Court are John W. Luciani and Bernard M. Rodin. Although Luciani and Rodin withdrew as general partners of Hillside effective July 26, 1996, after examining documents supplied to the Court it is unclear whether they are still limited partners of Hillside.[4] In any event, Luciani is the president of one corporation that is a Class B limited partner of Hillside with a .25% interest. Rodin is the general partner of four partnerships that are Class B limited partners of Hillside with a total interest of 97%. Sunset Downs Corporation, which is the general partner of Hillside, has a 2% interest. Grand Court's debt is purportedly secured by what appears to be all of Hillside's real and personal property pursuant to a financing statement that was filed on August 1, 1996, in the Office of the Missouri Secretary of State. However, Grand Court did not file a duplicate financing statement in the Office of the Recorder of Deeds of Jackson County, Missouri, the county in which Hillside's apartment complex is located.

Hillside's remaining scheduled debts are the unsecured priority claims for FICA taxes, FUTA taxes and real estate taxes in the total amount of $24,082.95, and the general unsecured claims of trade creditors in the total amount of $9731.16.

As mentioned above, on November 1, 1996, Hillside filed a disclosure statement and plan of reorganization. In the disclosure statement Hillside set out its proposed treatment of the creditors' claims and partnership interests. Hillside proposes to classify its creditors and partnership interests into seven separate classes composed of: (1) the allowed secured claim of Multi–Family; (2) the allowed secured claim of Grand Court; (3) the allowed unsecured claims of all unsecured creditors other than the unsecured portions

---

**3.** Because the note and deed of trust are non-recourse, under state law Multi–Family is permitted to foreclose on the property, but cannot look to other assets of the partners in order to recover any portion of the debt not satisfied by the proceeds of the foreclosure. *See John Hancock Mut. Life Ins. Co. v. Route 37 Business Park Assoc.,* 987 F.2d 154, 155 n. 1 (3d Cir.1993).

**4.** The Seventh Amendment of Limited Partnership Certificate and Agreement of Hillside Park Apts. L.P. (the "Amendment") states that John Luciani and Bernard Rodin only withdrew as general partners of the partnership. The Amendment shows that Luciani and Rodin did not sign the Amendment until August 8, 1996, which was after Hillside filed its bankruptcy petition. The Amendment shows that Luciani and Rodin are also Class B limited partners. Hillside's schedules do not show Luciani and Rodin withdrawing as Class B limited partners within one year of the bankruptcy filing. The schedules only show Luciani and Rodin withdrawing as general partners.

of the claims of Multi–Family and Grand Court; (4) the unsecured portions of the allowed claims of Multi–Family and Grand Court; (5) the allowed claims of the partners; (6) the allowed claims of Sunset Downs Corp.; and (7) the allowed interests of the partners. Hillside proposes to treat Multi–Family's Class 1 claim in the following manner:

*Class 1:* Should the Bankruptcy Court determine in a Final Order on the Complaint that the Hillside Note was modified pre-Petition by a course of dealing, is and was not in default, and is performable as modified by the Debtor's continued operation of the Property, then the Class 1 Claimant is *not* impaired and the Class 1 Claimant will retain its liens on the Property and the Debtor will continue to operate the Property in accordance with the terms of the Hillside Note, as modified. Provided that the Bankruptcy Court determines the Class 1 Creditor *is* impaired (by virtue of a Final Order determining same), the Allowed Claim of [Multi–Family] purportedly secured by a first lien encumbering the Property, [Multi–Family] may Elect treatment under Option A whether or not it has otherwise [made] a timely election under Section 1111(b) of the Bankruptcy Code. If [Multi–Family] has already made a timely election for Section 1111(b)(2) treatment, then [Multi–Family] may *not* Elect Option B treatment when it votes it's [sic] ballot regarding the Plan. Should [Multi–Family] fail to Elect a treatment when voting it's [sic] ballot regarding the Plan, and [Multi–Family] has *not* otherwise elected Section 1111(b)(2) treatment, then the Debtor, in it's [sic] sole and indisputable discretion, may Elect treatment for [Multi–Family] under either Option A or B. If, however, [Multi–Family] fails to Elect treatment under either Option A or B, *and* [Multi–Family] *has* elected treatment under Section 1111(b)(2), the[n] [Multi–Family] is deemed to have Elected treatment under Option A herein.

*Option A:* If Option A treatment is Elected, and a timely election under Section 1111(b)(2) of the Bankruptcy Code is made, then the Plan proposes to treat the entirety of [Multi–Family's] Claim as se-

cured by modifying, reinstating and extending the payments provided under the non-recourse promissory note allegedly held by [Multi–Family]. The interest rate will be reduced to the current market rate of interest for similar secured loans in the Greater Kansas City Metropolitan area if such rate is less than the stated interest rate in such note. Currently, the Debtor believes such market rate to be in the range of 8.5% to 8.625% per annum. The loan maturity date will be extended to December 15, 2026, although for the first 120 months following the Effective Date of the Plan, the Debtor will make monthly payments of its Net Cash Flow to [Multi–Family] on account of [Multi–Family's] Allowed Secured Claim. Any liens or security interests securing [Multi–Family's] Allowed Secured Claim will be preserved and continued. Under this option, should the Debtor fail to forward the Net Cash Flow, after notice and an opportunity to dispute or cure such alleged default, then [Multi–Family] may exercise its state law remedies regarding the Property. [Multi–Family] shall, upon receipt of the final installment to be paid by the Debtor, execute releases of any remaining encumbrances upon the property in a form satisfactory to the Debtor, and shall deliver same to the Debtor or the Debtor's designee. Nothing herein shall prohibit the Debtor or the Reorganized Debtor from refinancing or selling the Property at any time, without penalty, provided that the remaining unpaid portion of [Multi–Family's] Allowed Secured Claim shall be paid in full. Alternatively, should [Multi–Family], or the Debtor, decline Section 1111(b)(2) treatment and Elect to have a portion of [Multi–Family's] Allowed Claim under Option A valued as Secured and the remainder of the Allowed Claim denominated as Unsecured, then the Secured portion of [Multi–Family's] Allowed Claim shall be treated as described in Option A herein, and the Unsecured portion of the Allowed Claim would then receive treatment as a Class 4 Creditor.

*Option B:* If Option B treatment is Elected, and a timely election under Sec-

tion 1111(b)(2) of the Bankruptcy Code is *not* made, then the Plan proposes to treat the entirety of [Multi–Family's] Claim by providing for the payment, in full, in cash, at the Cash Out Price Closing of the Allowed Secured Claim of [Multi–Family], which is $2,500,000 based on the Debtor's estimate of the value of the Property. In this event, the Allowed Unsecured portion of [Multi–Family's] Allowed Claim would then receive treatment as a Class 4 Creditor. Should [Multi–Family] or the Debtor choose Option B treatment without making the 1111(b)(2) election then the "cash out" will take place at any time on or before three (3) years after the Effective Date on a date determined by the Debtor and in an amount equal to the Cash Out Price (the "Cash Out Price Closing"). The Cash Out Price will be arrived at either through consensus, or by valuation pursuant to § 506 of the Bankruptcy Code. The Cash Out Price is a defined term netting certain costs of closing and based upon a valuation of the Property. Under this option, the Allowed Claim of [Multi–Family], purportedly secured by a first lien encumbering the Property, will be modified, reinstated and extended. The interest rate will be reduced to the current market rate of interest for similar secured loans in the Greater Kansas City Metropolitan area if such rate is less than the stated interest rate in such note. Currently, the Debtor believes such market rate to be in the range of 8.5% to 8.625% per annum. The loan maturity date will be extended to December 15, 2026, although under this option, for the first 36 months following the Effective Date of the Plan, the Debtor will make monthly payments of its Net Cash Flow to [Multi–Family] on account of [Multi–Family's] Allowed Secured Claim; provided, however, each such monthly payment shall not be less than the monthly interest on the Cash Out Price. Any liens or security interests securing [Multi–Family's] Allowed Claim will be preserved and continued. Prior to the Cash Out Price Closing, [Multi–Family] will receive regular monthly payments on its Allowed Secured Claim equal to the Net Cash Flow generated by the Property in the preceding month; provided, however, each such monthly payment shall not be less than the monthly interest on the Cash Out Price. To the extent that such payments exceed interest on [Multi–Family's] Allowed Secured Claim, such payments will be applied to reduce principal and will be reduce [sic] the Cash Out Price on a dollar for dollar basis. Under this option, Debtor may, at any time, voluntarily deed the Property to [Multi–Family] in full satisfaction of [Multi–Family's] Allowed Secured Claim. In addition, should the Debtor fail to forward the Net Cash Flow, after notice and an opportunity to dispute or cure such alleged default, then [Multi–Family] may exercise its state law remedies regarding the Property. (Emphasis in original.)

Hillside proposes to pay Grand Court 90% of its allowed secured claim; pay 90% of the allowed claims of the Class 3 general unsecured creditors; and pay the unsecured portion of Multi–Family's claim and the unsecured portion of Grand Court's claim only a 1% distribution.

On December 4, 1996, Multi–Family filed an objection to Hillside's disclosure statement on two grounds. First, Multi–Family objects to the approval of the disclosure statement until Hillside files with the Court its operating reports for the months of August, September and October, 1996, and Multi–Family has had an opportunity to review same. Second, Multi–Family objects to approval of the disclosure statement contending that Hillside improperly classified its deficiency claim separately from the claims of the other unsecured creditors in an attempt to gerrymander the plan voting.

Multi–Family also filed a motion to lift the automatic stay or dismiss Hillside's bankruptcy case asserting that the stay should be lifted because Hillside has no equity in the apartment complex as the value of the property is less than the outstanding loan amount and Hillside cannot formulate a feasible plan of reorganization, or, alternatively, that the bankruptcy case should be dismissed on the grounds that the petition was improperly filed. The motion to lift stay or dismiss the bankruptcy case remains pending.

On November 1, 1996, Hillside filed a complaint for declaratory judgment, adversary proceeding number 96–4182, against Multi–Family and three other defendants. Hillside sought to have Multi–Family classified as something other than a creditor; to have the alleged claims and liens of Multi–Family equitably subordinated; to have the alleged claims and liens of Multi–Family disallowed for all purposes including voting on any plan; and to have certain alleged liens of Multi–Family determined to be unperfected and unenforceable. On February 3, 1997, this Court granted Multi–Family's motion to dismiss Hillside's adversary proceeding. This Court determined that each cause of action in Hillside's complaint for declaratory judgment failed to state a claim upon which relief could be granted.

On December 9, 1996, a hearing was held on Multi–Family's objection to Hillside's disclosure statement. After the hearing the Court took the matter under advisement and allowed the parties to submit post-hearing briefs. The Court ordered Hillside to file its brief by December 19, 1996, and Multi–Family to file its brief by December 30, 1996. On December 23, 1996, the Court denied a joint stipulation for enlargement of time to file briefs. Hillside filed its brief on January 2, 1997, and Multi–Family filed its brief on January 15, 1997. Even though both briefs were filed out of time, the Court did consider the arguments advanced and authorities cited in each brief. The Court expects each party to be timely in the future. The Court also has conducted its own independent research and is now ready to rule.

### Discussion

1. *Hillside's failure to file operating reports*

■ Multi–Family's objection to approval of the disclosure statement on the basis that Hillside has failed to file operating reports with the bankruptcy court is well taken. When read together, 11 U.S.C. § 704(8), 11 U.S.C. § 1106(a)(1), and Fed.R.Bankr.P. 2015(a)(3) require that the debtor-in-possession or the trustee in a Chapter 11 case file with the bankruptcy court "periodic reports and summaries of the operation of [the] business, including a statement of receipts and disbursements." Usually such a report is filed on a monthly basis. In its disclosure statement Hillside states that copies of its operating reports have been filed with the bankruptcy court pursuant to Bankruptcy Rule 2015(a)(3) and that such reports are available from the bankruptcy court for creditors to review. This Court's review of the file reveals that Hillside has never filed an operating report with the bankruptcy court. The Court will not approve Hillside's disclosure statement until Hillside has filed all of its operating reports with the bankruptcy court, which as of the date this order is entered would include the months of August, 1996, through January, 1997. The Court will sustain Multi–Family's objection on this ground.

2. *Hillside's improper classification of the unsecured portion of Multi–Family's claim*

In *In re Greystone III Joint Venture,* 995 F.2d 1274, 1277 (5th Cir.1991), *cert. denied,* 506 U.S. 821, 822, 113 S.Ct. 72, 121 L.Ed.2d 37 (1992), the Fifth Circuit explained:

Chapter 11 requires classifications of claims against a debtor for two reasons. Each class of creditors will be treated in the debtor's plan of reorganization based upon the similarity of its members' priority status and other legal rights against the debtor's assets. 11 U.S.C. § 1122. Proper classification is essential to ensure that creditors with claims of similar priority against the debtor's assets are treated similarly. Second, the classes must separately vote whether to approve a debtor's plan of reorganization. 11 U.S.C. § 1129(a)(8), (10). A plan may not be confirmed unless either (1) it is approved by two-thirds in amount and more than one-half in number of each "impaired" class, 11 U.S.C. §§ 1126(c), 1129(a)(8); or (2) at least one impaired class approves the plan, § 1129(a)(10), and the debtor fulfills the cramdown requirements of § 1129(b) to enable confirmation notwithstanding the plan's rejection by one or more impaired classes. Classification of claims thus affects the integrity of the voting process,

for, if claims could be arbitrarily placed in separate classes, it would almost always be possible for the debtor to manipulate "acceptance" by artful classification.

Multi–Family argues that Hillside improperly classified the unsecured portion of its claim separately from the claims of the general unsecured creditors in an attempt to manipulate the voting by creating at least one impaired class that would vote to approve the plan so that Hillside could cramdown its plan under section 1129(b). Multi–Family contends that Hillside must classify its deficiency claim with the claims of the general unsecured creditors because the deficiency claim is not any different from the Class 3 unsecured claims and no independent reason exists that warrants separate classification.

Multi–Family asserts that even if its Class 1 claim could be considered impaired, it will not vote to accept the plan and, therefore, Class 1 cannot constitute an accepting class under section 1129(a)(10). Multi–Family points out that Classes V, VI and VII are classes of insiders of Hillside which cannot constitute an accepting class under section 1129(a)(10).

■ Multi–Family attacks the ability of Grand Court to be an accepting impaired creditor arguing that Grand Court is an insider of Hillside. Multi–Family further argues that Grand Court merely has an unsecured claim that also must be classified with the claims of the Class 3 general unsecured creditors. The Court first will examine whether Grand Court is in fact an insider of Hillside. The term "insider" is defined in 11 U.S.C. § 101(31). If the debtor is a partnership, an insider includes a general partner of the debtor; a relative of a general partner in, general partner of, or person in control of the debtor; a partnership in which the debtor is a general partner; a general partner of the debtor; or a person in control of the debtor. 11 U.S.C. § 101(31)(C). The Bankruptcy Code's "use of the word 'includes' is intended to denote a general class for which the statute provides a nonexhaustive list of members." *In re Gilbert,* 104 B.R. 206, 209 (Bankr.W.D.Mo.1989).

■ "The determination of insider status is a question of fact." *In re Friedman,* 126 B.R. 63, 67 (9th Cir. BAP 1991). *See also In re Hydraulic Indus. Prod. Co.,* 101 B.R. 107, 109 (Bankr.E.D.Mo.1989). "[I]nsider status must be determined on a case by case basis through examination of the totality of the circumstances and the creditor's degree of involvement in the debtor's affairs." *In re Chas. P. Young Co.,* 145 B.R. 131, 136 (Bankr.S.D.N.Y.1992). One factor in determining insider status is the closeness of the relationship between the parties. *In re Anderson,* 165 B.R. 482, 486 (Bankr.D.Or. 1994). "[A]n insider is one who has a sufficiently close relationship with a debtor that his conduct is made subject to closer scrutiny." *Hydraulic Indus. Prod.,* 101 B.R. at 109. The exclusion of insiders of an impaired class from voting on a reorganization plan under section 1129(a)(10) "recognizes that where a creditor is under the debtor's proverbial thumb due to the parties' affinity of interests, that creditor is less likely, perhaps even incapable, of casting a vote formed on an independent judgment of what will best serve his interests, much less those of his fellow class members." *Gilbert,* 104 B.R. at 210.

■ Here, the Court finds that Grand Court is an insider of Hillside. Luciani and Rodin are the officers and directors of Grand Court. Luciani and Rodin were the general partners of Hillside up until at least July 26, 1996, which was eleven days before Hillside filed for bankruptcy protection. Luciani is the president of a corporation which has only a .25% limited partnership interest in Hillside, however, Rodin is the general partner of four partnerships that have a 97% limited partnership interest in Hillside. In this case, Grand Court and Hillside are so closely connected that Grand Court is under Hillside's "proverbial thumb" and will cast whatever vote Hillside wants it to cast.

■ The Court also determines that Grand Court failed to properly perfect its security interest under the Missouri Uniform Commercial Code, Mo.Rev.Stat. § 400.9–401.(1)(c) (1994), and, therefore, it only has a general unsecured claim. Although Grand Court filed its financing statement in the

Office of the Missouri Secretary of State, Grand Court failed to file a duplicate financing statement in the Office of the Recorder of Deeds of Jackson County, Missouri, the county in which Hillside's apartment complex is located. Further, the purported lien may be susceptible to being set aside as a preferential transfer under 11 U.S.C. § 547(b). The financing statement was filed in the Secretary of State's office on August 1, 1996, and Hillside filed its bankruptcy petition on August 5, 1996. In its disclosure statement Hillside classifies the unsecured claim of Grand Court in Class 4 with the unsecured portion of Multi–Family's claim. Hillside has not offered any reason to the Court nor has the Court independently found any reason that would justify classifying Grand Court's general unsecured claim separately from the claims of the Class 3 general unsecured creditors. Grand Court's claim, therefore, must be classified with the Class 3 claims.

Hillside is fully aware that Multi–Family will vote both its secured and deficiency claim against any proposed plan of reorganization. Hillside only needs the approval of at least one class of impaired claims to attempt cramdown of its plan under 11 U.S.C. § 1129(b). The unsecured portion of Multi–Family's claim dwarfs the combined amount of the remaining claims of the general unsecured creditors. It is obvious that Hillside's only chance of cramming down its plan is by classifying the unsecured portion of Multi–Family's claim separately from the claims of the general unsecured creditors and hoping that the remaining general unsecured creditors will meet the voting requirements of section 1126(c).

Hillside asserts that it may separately classify the unsecured portion of Multi–Family's claim from the claims of the general unsecured creditors because (1) the plain language of 11 U.S.C. § 1122(a) supports separate classification; (2) the assignment documents whereby Multi–Family acquired the underlying note and deed of trust contain several covenants related to continuing obligations by Multi–Family to perform certain duties related to the National Housing Act; (3) the existence of Hillside's adversary proceeding in which Multi–Family is named as a defendant; (4) Multi–Family acquired the Hillside note and deed of trust at a discount; (5) by doing so it will be able to treat the general unsecured creditors more generously in its plan because the trade creditors directly provided goods and services to Hillside and will likely continue to have an ongoing business relationship with Hillside; (6) the legal rights of Multi–Family as a section 1111(b) claimant are significantly different than the rights of the general unsecured claimants; and (7) any concerns regarding gerrymandering can be dealt with by the confirmation requirements of section 1129(b).

■ Whether Hillside manipulated the terms of its plan for purposes of securing confirmation is a question of fact. *See In re Windsor on the River Assoc., Ltd.,* 7 F.3d 127, 132 (8th Cir.1993). The Court will address in turn each of Hillside's contentions that it properly separately classified Multi–Family's deficiency claim.

### A. *Separate classification based upon Multi–Family's rights as a section 1111(b) claimant*

Hillside's first and sixth reasons for separate classification both revolve around the same argument, therefore, the Court will address them together. Hillside contends that it may separately classify the unsecured portion of Multi–Family's claim under section 1122(a) because the legal rights of Multi–Family as a section 1111(b) claimant are substantially different from those of a general unsecured claimant. Hillside cites *In re Woodbrook Assoc.,* 19 F.3d 312 (7th Cir. 1994), in support of its position.

■ Section 1122(a) of the Bankruptcy Code states that "[e]xcept as provided in subsection (b) of this section [which is not relevant here], a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class." "While [section 1122(a) ] bars aggregating dissimilar claims in the same class, it does not explicitly address whether similar claims must be placed in the same class." *In re Boston Post Road Ltd. Partnership,* 21 F.3d 477, 481 (2d Cir.1994), *cert. denied,* 513 U.S. 1109, 115 S.Ct. 897, 130 L.Ed.2d 782 (1995).

However, there is one clear rule on section 1122(a) claims classification: "thou shalt not classify similar claims differently in order to gerrymander an affirmative vote on a reorganization plan." *Greystone*, 995 F.2d at 1279. In *Hanson v. First Bank of South Dakota, N.A.*, 828 F.2d 1310, 1313 (8th Cir.1987), the Eighth Circuit opined:

> The debtor's discretion to place similar claims in different classes is not unlimited, however. Classifications designed to manipulate class voting must be carefully scrutinized. There is potential for abuse when the debtor has the power to classify creditors in a manner to assure that at least one class of impaired creditors will vote for the plan, thereby making it eligible for the cram down provisions.

■ Section 1122(a) permits separate classification of substantially similar claims in separate classes only if there exist "reasons independent of the debtor's motivation to secure the vote of an impaired, assenting class of claims." *Greystone*, 995 F.2d at 1279.

Here, Multi–Family holds a non-recourse claim that exceeds the value of the collateral, which implicates 11 U.S.C. §§ 506(a) and 1111(b). *See In re Barakat*, 99 F.3d 1520, 1524 (9th Cir.1996). Section 506(a) provides that a claim secured by a lien on property is considered secured up to the value of such property and unsecured for the remainder. In 4 Norton Bankruptcy Law and Practice 2d, Scope of Topic p. 89–1 (1994), the authors clearly and concisely explain that 11 U.S.C. § 1111(b):

> provides that a secured claim is to be treated as a recourse claim in Chapter 11 whether or not the claim is nonrecourse by agreement or applicable law, and allows secured claimholders to elect between treatment of their claims as recourse claims and treatment of the difference between the value of the collateral and the amount of the debt as an unsecured claim, or treatment of their claims as secured claims to the full extent their claims are allowed, rather than merely to the extent of the value of the collateral.

In *Woodbrook*, the Seventh Circuit also explained that:

A § 1111(b) unsecured deficiency claim is created in favor of an undersecured creditor in the amount of the lien in excess of the collateral's value, i.e., an undersecured creditor has a secured claim up to the value of the collateral and an unsecured claim for the deficiency. 11 U.S.C. §§ 506(a), 1111(b). An undersecured creditor, however, may waive its deficiency claim and elect, under § 1111(b)(2), to have its claim treated as secured for the entire amount of the debt.

*Woodbrook*, 19 F.3d at 317 n. 2.

■ "The purpose of the Section 1111(b) election is to allow the undersecured creditor to weigh in its vote with the votes of the other unsecured creditors." *Boston Post Road Ltd. Partnership*, 21 F.3d at 483.

■ In this case, Multi–Family did not elect to have its claim treated as a secured claim to the full extent of its allowed claim, and has emphasized to this Court and Hillside that it will not make such an election. It is clear that Multi–Family wants to vote on the plan in the amount of its unsecured deficiency claim.

In *Woodbrook* the Seventh Circuit determined that the debtor could classify the section 1111(b) unsecured deficiency claim of the United States Department of Housing and Urban Development ("HUD") separately from the claims of the general unsecured creditors for the reason that "[s]ignificant disparities do exist between the legal rights of the holder of a § 1111(b) claim and the holder of a general unsecured claim which render the two claims not substantially similar and which preclude the two from being classified together under § 1122(a)." *Woodbrook*, 19 F.3d at 318. However, the Eighth Circuit has addressed the issue of separate classification of a section 1111(b) unsecured deficiency claim and has held that an unsecured recourse claim that arises by operation of law under 11 U.S.C. § 1111(b) does not alone " 'warrant separate classification . . . because under the Code the undersecured portion of a claim is an unsecured claim.' " *In re Lumber Exchange Bldg. Ltd. Partnership*, 968 F.2d 647, 649 (8th Cir. 1992) (quoting *Hanson v. First Bank of*

*South Dakota, N.A.,* 828 F.2d 1310, 1313 (8th Cir.1987)). *See also Barakat,* 99 F.3d at 1526 (It is impermissible for a debtor to classify a section 1111(b) deficiency claim separately from general unsecured claims.); *Boston Post Road Ltd. Partnership,* 21 F.3d at 483 ("Allowing the unsecured trade creditors to constitute their own class would effectively nullify the option that Congress provided to undersecured creditors to vote their [section 1111(b) ] deficiency [claim] as unsecured debt."); *Windsor on the River,* 7 F.3d at 131 (Although this case involved an oversecured creditor and the issue before the court concerned artificial impairment and not artificial classification of claims, the Eighth Circuit cited favorably to the holding in *Lumber Exchange.*); *Greystone,* 995 F.2d at 1279–80 (debtor may not separately classify a section 1111(b) unsecured deficiency claim separately from other unsecured claims); *John Hancock Mut. Life Ins. Co.,* 987 F.2d at 160–61 (same).

The Eighth Circuit has spoken on this issue and in this circuit an unsecured recourse claim is to be treated like any other unsecured claim even though the deficiency claim arose by operation of section 1111(b). Here, Hillside may not separately classify Multi–Family's deficiency claim from the claims of the general unsecured creditors for the reason that Multi–Family's claim arose by operation of 11 U.S.C. § 1111(b).

### B. *Multi–Family's alleged non-creditor interests in Hillside's property*

Hillside argues that it may separately classify the unsecured portion of Multi–Family's claim because the assignment documents whereby Multi–Family acquired the underlying note and deed of trust contain several covenants regarding continuing obligations by Multi–Family to perform certain duties related to the National Housing Act. At the hearing held on December 9, 1996, Hillside did not present any evidence of HUD covenants to which Multi–Family is obligated. Hillside stated in its post-hearing brief that the assignment and covenants were attached to the brief as Exhibit A, but Exhibit A was not attached to the brief. Hillside argues that the HUD covenants are a non-creditor interest in the property, specifically public interests under the National Housing Act, that distinguishes Multi–Family's unsecured claim from the claims of the general unsecured creditors and warrants separate classification of Multi–Family's deficiency claim.

Hillside relies on *In re Briscoe Enter., Ltd., II,* 994 F.2d 1160 (5th Cir.1993), *cert. denied,* 510 U.S. 992, 114 S.Ct. 550, 126 L.Ed.2d 451 (1993), and *In re The Way Apartments, D.T.,* 201 B.R. 444 (N.D.Tex. 1996), as support for its position. In *Briscoe* the Fifth Circuit determined that because the City of Fort Worth, Texas, which held an unsecured junior lien in property of the debtor, had distinct non-creditor interests relating to its urban housing program and contributed $20,000 per month in rental assistance to the debtor, the debtor could separately classify the City's unsecured claim from the claims of the general unsecured creditors. The Fifth Circuit emphasized that its holding in this case was narrow. *Briscoe,* 994 F.2d at 1167. In *Way Apartments* the district court affirmed the bankruptcy court's confirmation of the debtor's plan, which had separately classified the unsecured portion of HUD's undersecured claim from the claims of the general unsecured creditors. The court stated that a good business reason existed to separately classify HUD's deficiency claim because HUD had non-creditor interests in the debtor's property, specifically public interests under the National Housing Act. *Way Apartments,* 201 B.R. at 451.

Multi–Family agrees that the Hillside property is a HUD project and involves a defaulted HUD loan. However, Multi–Family argues that it took the assignment from HUD before the bankruptcy case was filed and adamantly maintains that it has never admitted and in fact does not have non-creditor interests in the property similar to the non-creditor interests found in *Way Apartments* or *Briscoe.* Multi–Family asserts that *Way Apartments* and *Briscoe* are distinguishable because the lienholders at the time the bankruptcy cases were filed were the City of Fort Worth and HUD, respectively, and not private lending institutions or investors. Multi–Family also points out that even though the Seventh Circuit in *Wood-*

*brook* held that the debtor could separately classify HUD's section 1111(b) deficiency claim from the claims of general unsecured creditors, the court did not address or rely upon HUD's non-creditor interests in the debtor's property as a basis for separate classification.

■ Before the Court can begin the legal analysis of whether or not Multi–Family's non-creditor interests in Hillside's property allow Hillside to separately classify Multi–Family's deficiency claim, the Court needs to know exactly what non-creditor interests Multi–Family has in the property. Multi–Family contends that it has never admitted and in fact does not have non-creditor interests in the property. Hillside asserts that Multi–Family is obligated by covenants with HUD to perform certain duties related to the National Housing Act. However, Hillside presented no evidence to the Court at the December 9 hearing of such obligations on the part of Multi–Family, nor did it supply any information post-hearing to the Court of such obligations. The existence of non-creditor interests was a disputed issue of fact for which Hillside offered no evidence. In the face of a lack of evidence showing that Multi–Family has a non-creditor interest in Hillside's property, specifically public interests under the National Housing Act, the Court finds that Multi–Family does not have non-creditor interests in the property. Hillside cannot use this distinction as a basis to separately classify Multi–Family's deficiency claim from the claims of the general unsecured creditors.

### C. *Hillside's adversary proceeding in which Multi–Family is named as a defendant*

Hillside argues that because Multi–Family is named as a defendant in adversary proceeding number 96–4182 and because resolution of that adversary proceeding in Hillside's favor could result in the total disallowance or subordination of Multi–Family's claim, Hillside may separately classify Multi–Family's deficiency claim from the claims of general unsecured creditors. In support of its argument, Hillside relies on two cases in which the courts allowed separate classification of a creditor's claim when that creditor was involved in litigation with the debtor.

Here, the Court dismissed Hillside's adversary proceeding in an order entered on February 3, 1997. Hillside may not use the existence of the adversary proceeding as a basis to separately classify the unsecured portion of Multi–Family's claim from the claims of general unsecured creditors.

### D. *Multi–Family's purchase of the Hillside note and deed of trust at a discount*

Hillside asserts that it may separately classify Multi–Family's deficiency claim because Multi–Family bought the Hillside note and deed of trust at a discount in a portfolio of some 158 different loans. Hillside concedes that it does not know exactly how much Multi–Family paid for the note and deed of trust, but is sure that it is substantially less than the full amount of the claim and probably less than the current market value of the property. Hillside argues that because Multi–Family did not in fact expend the sums that make up its deficiency claim, Multi–Family does not have the concerns of a normal creditor in recovering the deficiency sum.

■ The Court determines that even if Multi–Family purchased the note and deed of trust at a discount, this does not provide a basis to distinguish the unsecured deficiency claim of Multi–Family from the claims of the general unsecured creditors. How much Multi–Family paid for the note and deed of trust is irrelevant. Multi–Family owns the note and deed of trust, Multi–Family has a claim against Hillside and Multi–Family has the same interest in getting paid as the other creditors. Hillside may not separately classify Multi–Family's deficiency claim from the other unsecured claims just because Multi–Family may have purchased the note and deed of trust at a discount.

### E. *More generous treatment of trade creditors' claims*

■ Hillside argues that it wants to separately classify Multi–Family's deficiency claim from the claims of the general unse-

cured creditors so that it will be able to treat the trade creditors' claims more generously. Hillside proposes a 90% distribution to the trade creditors for their claims and a 1% distribution to Multi–Family on its deficiency claim. Hillside asserts that it proposes to treat the trade creditors' claims much more generously than Multi–Family's deficiency claim because the trade creditors directly provided goods and services to Hillside and will likely continue to have an ongoing business relationship with Hillside. Hillside states that its proposed treatment of Multi–Family's deficiency claim reflects the value of the property and the fact that Multi–Family purchased its claim at a discount.

■ This Court has ruled above that it is irrelevant whether or not Multi–Family purchased the note and deed of trust at a discount. Multi–Family has an unsecured claim against Hillside just like the trade creditors have unsecured claims against Hillside. In *Hanson* the debtors attempted to separately classify the trade creditors' claims from the deficiency claims of two undersecured creditors arguing that the trade creditors had a different stake in the future viability of the reorganized debtor. The Eighth Circuit rejected the argument in this case and opined that "[a]lthough there is some case authority for this distinction ... the interests of trade creditors are not sufficiently 'unique' to warrant separate classification." *Hanson,* 828 F.2d at 1313.

Likewise, in *Lumber Exchange* the debtor argued that separate classification of the trade creditors' claims from the deficiency claim of its undersecured mortgagee was warranted "because secured creditors look to different assets for repayment than do unsecured creditors and because the maintenance of good business relationships is important to a debtor's business." *Lumber Exchange,* 968 F.2d at 649. The Eighth Circuit opined:

> There is some authority for the proposition that a plan may classify trade creditors separately from, and treat them more generously than, other creditors if doing so is necessary to a debtor's ongoing business. *See Hanson,* 828 F.2d at 1313; *Greystone,* 948 F.2d at 141. The integrity of Lumber Exchange's argument, however, is belied

here by the plan's own terms. The proposed plan treats trade creditors less generously, not more. Accordingly, we conclude that this proffered justification for separate classification is not legitimate.

*Id.*

Here, Hillside may not merely propose to treat the trade creditors more generously under the reorganization plan as justification for the separate classification of their unsecured claims, it must show that doing so is necessary to its ongoing business. For example, Hillside presented no evidence of a limited market in Kansas City for trade goods and services and presented no evidence that it would be unable to obtain any of the trade services if the trade creditors did not receive preferential treatment under the plan. *See Greystone,* 995 F.2d at 1281. Accordingly, Hillside may not separately classify Multi–Family's deficiency claim from the claims of the general unsecured creditors for the factually unsupported reason that it wants to treat the trade creditors' claims more generously in the plan.

F. *Contention that any gerrymandering concerns can be resolved at the hearing on confirmation*

Hillside argues that any concerns raised by Multi–Family regarding gerrymandering can be dealt with by the confirmation requirements of 11 U.S.C. § 1129(b) and that the Court should delay ruling on Multi–Family's objection to the disclosure statement and address this issue at the hearing on confirmation.

■ First, this Court is not required to wait until the hearing on confirmation to address the issue of artificial classification, or gerrymandering, raised by a creditor in its objection to the disclosure statement. *See Hanson,* 828 F.2d at 1313 n. 5; *In re Stoneridge Apartments,* 125 B.R. 794, 795–97 (Bankr.W.D.Mo.1991). Further, for reasons of judicial economy the bankruptcy court should address and rule upon a gerrymandering issue raised by a creditor in its objection to the debtor's disclosure statement when, as in this case, resolution of the issue will be dispositive as to the outcome of further proceedings. There is no need to waste

time and money on a confirmation hearing that will only prove to be futile because of Hillside's improper classification of Multi–Family's deficiency claim. Because Hillside must classify Multi–Family's unsecured claim with the other general unsecured claims and because Multi–Family's deficiency claim dwarfs the remaining unsecured claims, Hillside will not be able to obtain the approval of its plan by at least one class of impaired creditors and, therefore, will not be able to seek cramdown of its plan under section 1129(b).

## G. *Summary*

In this case, Hillside has provided no good business reason or legitimate justification for separately classifying Multi–Family's deficiency claim from the claims of the other general unsecured creditors. The Court finds that Hillside manipulated the terms of its plan by artificially classifying Multi–Family's deficiency claim in an attempt to obtain the approval of at least one class of impaired claims in order to attempt cramdown of its plan under section 1129(b). The Court determines that Hillside must classify the unsecured portion of Multi–Family's claim with the general unsecured claims. The Court will sustain Multi–Family's objection to Hillside's disclosure statement on the grounds of improper classification of its deficiency claim.

## *Conclusion*

Based on the above discussion, the objection filed by Multi–Family Mortgage Trust 1996–1 to Hillside's disclosure statement is SUSTAINED.

The foregoing Memorandum Order constitutes Findings of Fact and Conclusions of Law as required by Fed.R.Bankr.P. 7052.