PUBLISHED

# UNITED STATES COURT OF APPEALS

# FOR THE FOURTH CIRCUIT

ALGERNON L. BUTLER, JR., Trustee
for Ed Tatum Motors, Incorporated,
<u>Plaintiff-Appellant,</u>

No. 94-2636

v.

DAVID SHAW, INCORPORATED,
<u>Defendant-Appellee.</u>

Appeal from the United States District Court
for the Eastern District of North Carolina, at Raleigh.
Terrence W. Boyle, District Judge.
(CA-94-43-5-BO, BK-93-41-8-S-AP)

Argued: November 1, 1995

Decided: January 3, 1996

Before WILKINSON, LUTTIG, and WILLIAMS, Circuit Judges.

_____

Affirmed by published opinion. Judge Williams wrote the opinion, in
which Judge Wilkinson and Judge Luttig joined.

_____

## COUNSEL

**ARGUED:** Algernon L. Butler, Jr., Wilmington, North Carolina, for
Appellant. Ocie F. Murray, Jr., SINGLETON, MURRAY, CRAVEN
& INMAN, Fayetteville, North Carolina, for Appellee.

_____

**OPINION**

WILLIAMS, Circuit Judge:

Appellant Algernon L. Butler, Jr., the trustee in bankruptcy for Ed Tatum Motors, Incorporated (the debtor), appeals an order of the district court affirming a decision of the bankruptcy court. The bankruptcy court held that Butler was not entitled to avoid two transfers made by the debtor to Appellee David Shaw, Incorporated (Shaw, Inc.) within one year of the debtor's petition in bankruptcy because Shaw, Inc. was not an insider of the debtor at the time of the transfers. Finding no error, we affirm.

I.

The facts necessary to resolve this case are not in dispute. David Shaw (Shaw) is the president and sole shareholder of Shaw, Inc., a Ford automobile dealership located in Elizabethtown, North Carolina. In 1989, Shaw approached Edward Lee Tatum, then the general manager of an automobile dealership in North Carolina, about purchasing the assets of Shaw, Inc. After lengthy negotiations, Shaw, Inc. and Tatum[1] executed an agreement under which Tatum purchased the assets of Shaw, Inc. for $710,000.[2] Of this amount, Shaw, Inc. received $500,000 in cash and $200,000 in the form of a promissory note, and Shaw received an option, which he exercised, to purchase 22.22% of the debtor's authorized stock for $10,000. [3] In addition,

_____

[1] Although Tatum purchased the assets of Shaw, Inc. in his own name, shortly thereafter he created the debtor and transferred the purchased assets to it.

[2] There is a conflict in the testimony as to whether the $710,000 reflected in the purchase agreement was the actual purchase price. According to Tatum, the purchase price was $910,000, but this fact could not be reflected in the purchase agreement because Ford would not authorize a purchase price greater than $710,000. Tatum claimed that the remaining $200,000 was given to Shaw, Inc. in the form of a promissory note. During his testimony, Shaw directly contradicted Tatum's version of events. We need not resolve this conflict in the evidence because Shaw, Inc. later relinquished its right to payment of the indebtedness arising from the sale of the assets.

[3] Shaw later invested an additional $75,000 in exchange for more of the debtor's stock, resulting in his ownership of 35% of the outstanding stock.

Tatum agreed to employ Shaw and Shaw's wife and son. In a separate agreement, the debtor leased the premises upon which the dealership was located from Shaw, Inc. for $7,000 per month. The lease also specified that the debtor was responsible for the payment of taxes on the property.

After the sale, Shaw retained the title of manager but did not exercise any managerial authority over the debtor's operations or personnel. Rather, Shaw primarily acted as a salesman and, secondarily, retrieved parts and automobiles from other dealerships when necessary.

The debtor experienced losses throughout its operating life, and by January 1991 it was evident that the debtor could not continue to operate without an infusion of capital. To enhance the attractiveness of the dealership to potential investors, Shaw offered to relinquish his stock in the debtor and to forgive its indebtedness to Shaw, Inc. In exchange, Shaw asked that the debtor employ him as a consultant for a period of ten years. An attorney reduced this agreement ("the stock-relinquishment agreement") to writing in February 1991, but the agreement was not executed at that time.

The debtor was not delinquent in its lease payments to Shaw, Inc. when Shaw offered to relinquish his stock. However, thereafter the debtor was unable to make its monthly lease payments in February, March, and April. Additionally, the debtor failed to pay 1990 property taxes of $5,795.12 on the leased premises. Shaw, Inc. paid those taxes on February 27, 1991 because Shaw wished to avoid the embarrassment of having the taxes listed as delinquent in the local newspaper.

In May 1991, Tatum reached an agreement ("the stock-purchase agreement") with two outside investors, Walter Campbell and Paul Layton. Campbell and Layton pledged to make $300,000 available to the debtor in the form of a capital investment of $37,500 in exchange for 49% of the stock of the debtor and a loan of $262,500. Neither Shaw, Inc. nor Shaw was a party to this agreement, nor did Shaw participate in the negotiations.

At a closing on May 6, Shaw and the debtor executed the stock-relinquishment agreement, thereby making Shaw's stock available for

3

purchase by Campbell and Layton. Tatum, Campbell, and Layton executed the stock-purchase agreement immediately thereafter. Later that afternoon, Tatum deposited the funds received from Campbell and Layton into the debtor's corporate account and drew several checks on the account to pay off all of the debtor's arrearages. These checks included two to Shaw, Inc.: one brought current the lease payments and the other reimbursed Shaw, Inc. for the 1990 property taxes it had paid. Total payments to Shaw, Inc. were $33,795.12. The checks were presented for payment late in the afternoon of May 6 and were honored on May 7.

Unfortunately, the debtor was not helped by the infusion of capital. After struggling for several more months, the debtor filed a Chapter 7 bankruptcy petition on November 18, 1991. Butler subsequently instituted this action seeking to avoid the May 7 transfers to Shaw, Inc. on the basis that they were preferential transfers to an insider made within one year of the filing of the bankruptcy petition. See 11 U.S.C.A. § 547(b)(4)(B) (West 1993).[4] Butler argued that Shaw, Inc. was an insider at the time of the transfers either under the statutory definitions of the terms "transfer" and "insider," see 11 U.S.C.A. § 101(31), (54) (West 1993),[5] or because of Shaw's close relationship to Tatum, see Hunter v. Babcock (In re Babcock Dairy Co.), 70 B.R. 662, 666 (Bankr. N.D. Ohio 1986). The bankruptcy court granted judgment to Shaw, Inc., concluding that Shaw, Inc. was not an insider under either theory at the time of the challenged transaction. The district court affirmed, and Butler now appeals to this court.

We review de novo the decision of the district court, effectively standing in its place to review directly the findings of fact and conclusions of law made by the bankruptcy court. See First Nat'l Bank v. Stanley (In re Stanley), 66 F.3d 664, 667 (4th Cir. 1995). While we exercise plenary review of the bankruptcy court's legal conclusions, its factual findings may not be set aside unless they are clearly errone-

---

[4] Butler sought to recover $22,672, the amount of the transfers less certain setoffs.
[5] A previous version of 11 U.S.C.A. § 101 contained two subsections numbered (54), one defining the term "transfer" and the other defining the term "stockbroker." See Barnhill, 112 S. Ct. at 1389 n.4. The statute has since been amended to eliminate the discrepancy.

4

ous. Id. The proper interpretation of the bankruptcy code is a question of federal law. See Barnhill v. Johnson, 503 U.S. 393, 397-98 (1992).

II.

A trustee in bankruptcy may avoid transfers made up to one year prior to the filing of the petition in bankruptcy if the transferee "at the time of such transfer was an insider." 11 U.S.C.A. § 547(b)(4)(B) (emphasis added).**6** The bankruptcy code defines insider, in pertinent part, as an "affiliate, or insider of an affiliate as if such affiliate were the debtor." 11 U.S.C.A. § 101(31)(E). An affiliate, in turn, is an "entity that directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor." 11 U.S.C.A. § 101(2)(A) (West 1993).

Here, Shaw was an affiliate of the debtor because he owned more than twenty percent of the debtor's stock. And, Shaw's control over Shaw, Inc. made Shaw, Inc. an insider to Shaw. See 11 U.S.C.A. § 101(31)(A)(iv). Thus, until the execution of the stock-relinquishment agreement on May 6, 1991, Shaw, Inc. was an insider of the debtor by virtue of Shaw's ownership of the debtor's stock, i.e., Shaw, Inc. was the insider of an affiliate of the debtor, and therefore an insider of the debtor in its own right. See Kroh Bros. Dev. Co. v. United Missouri Bank (In re Kroh Bros. Dev. Co.), 137 B.R. 332, 334 (W.D. Mo. 1992).

Thus, the question before us is not whether Shaw, Inc. was an insider, but rather whether Shaw, Inc. was an insider at the time of the challenged transfers. The plain language of the bankruptcy code indicates that Shaw, Inc. ceased to be an insider when Shaw relinquished his stock in the debtor on May 6, 1991, see 11 U.S.C.A. § 101(2)(A), (31)(E), and that the challenged transfers occurred on

_____

**6** The purposes of the trustee's avoidance power are twofold. See In re Smith, 966 F.2d 1527, 1535 (7th Cir.), cert. dismissed, 113 S. Ct. 683 (1992). First, the power to avoid preferential transfers ensures that each creditor in the same class will receive the same pro rata share of the debtor's estate. Id. Second, the avoidance power "reduces the incentive to rush to dismember a financially unstable debtor" by allowing the trustee to recoup last-minute payments to creditors. Id.

5

May 7, 1991, see Barnhill, 503 U.S. at 399-400 (interpreting the term "transfer" as defined in 11 U.S.C.A. § 101(54)). It would appear to be fairly clear, then, that Shaw, Inc. was not an insider at the time of the challenged transfers. Butler advances two theories as to why such straightforward reasoning is incorrect. First, he argues that a transfer can span a period of time, and that because Shaw, Inc. was an insider by virtue of Shaw's stock ownership when the challenged transfers began, the transfers are avoidable. Alternatively, Butler argues that Shaw, Inc. should be considered an insider by virtue of Shaw's close relationship to Tatum and the debtor, a relationship that was not extinguished by Shaw's relinquishment of his stock. We address these arguments in turn.

A.

Butler's first argument, that Shaw, Inc. was an insider at the time of the transfers, rests upon a strained interpretation of the term "transfer" as defined in the bankruptcy code. See 11 U.S.C.A. § 101(54).[7] Butler argues that a transfer is not a single occurrence, but rather a related sequence of events. Thus, a transfer has a beginning and an end; it is not a unitary event occurring at a single moment in time. Butler further argues that insider status does not cease until the insider's influence over a particular transaction has run its course, i.e., until the transfer is complete. Here, Butler posits that the transfer to Shaw, Inc. began when Shaw executed the stock-relinquishment agreement and concluded with the honor of the checks to Shaw, Inc. Because Shaw, Inc. was an insider when the transaction began, Butler maintains, its influence remained throughout the events comprising the transfers, and the transfers should be avoided.

Even if we were tempted to adopt Butler's novel interpretation of the bankruptcy code, the Supreme Court's decision in Barnhill renders us powerless to do so. In Barnhill, the Court construed the very provision at issue here and clearly held that a transfer by check is a single event occurring at a definite moment in time:

_____

[7] Section 101(54) provides that "`transfer' means every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or with an interest in property." 11 U.S.C.A. § 101(54).

6

> [R]eceipt of a check gives the recipient no right in the funds held by the bank on the drawer's account. Myriad events can intervene between delivery and presentment of the check that would result in the check being dishonored. The drawer could choose to close the account. A third party could obtain a lien against the account by garnishment or other proceedings. The bank might mistakenly refuse to honor the check.
>
> The import of the preceding discussion for the instant case is that no transfer of any part of the debtor's[funds] occurred until the bank honored the check . . . . We thus believe that when the debtor has directed the drawee bank to honor the check and the bank has done so, the debtor has implemented a "mode, direct or indirect .. . of disposing of property or an interest in property." [11 U.S.C.A. § 101(54).] For the purposes of payment by ordinary check, therefore, a "transfer" as defined by § 101(54) occurs on the date of honor, and not before.

Barnhill, 503 U.S. at 399-400 (third emphasis added; citations & footnote omitted).**8** Thus, it is irrefutable that the transfers to Shaw, Inc. occurred after it had ceased to be an insider.**9**

_____

**8** Butler claims that Barnhill provides guidance only as to the point at which a transfer is concluded, without addressing the point at which a transfer begins. In our view, the Court's statement that a transfer by check occurs on the date of honor "and not before," Barnhill, 503 U.S. at 400, is indicative of its conclusion that transfers under the bankruptcy code simply do not have "beginnings" and "endings," as Butler would have us believe.

**9** Butler's argument that Shaw's relinquishment of his stock was made as a quid pro quo for the payment of the indebtedness to Shaw, Inc. is not supported by the testimony at the trial before the bankruptcy court. Cf. Pirrone v. Toboroff (In re Vaniman Int'l, Inc.) , 22 B.R. 166, 188-89 (Bankr. E.D.N.Y. 1982) (finding transfer avoidable when relinquishment of stock occurred simultaneously with, and was a quid pro quo for, the challenged transfer). When Shaw offered to relinquish his stock in order to make the dealership a more attractive investment, the debtor was not behind in its lease payments to Shaw, Inc., and property taxes had not

7

Similarly, we reject Butler's approach because it would require us to expand the statutory definition of the term "insider" in a manner that leads to an unduly litigious result. Obviously, in many cases it will be difficult, if not impossible, for a court to determine when an insider's influence has ceased to affect the actions of the debtor. In light of the Supreme Court's clear preference for bright-line rules in this area of the law, we are loathe to adopt an interpretation of the bankruptcy code that would blur the line established by 11 U.S.C.A. § 101(2)(A), (31)(E).**10**

B.

Butler next argues that Shaw, Inc. should be deemed an insider because of Shaw's close relationship with Tatum. It is well settled that the statutory definition of insider is not exhaustive; "[r]ather, an insider may be any person or entity whose relationship with the

_____

been assessed. Also, Shaw specifically testified that he did not condition the relinquishment of his stock on the payment of the back rent and taxes.

Butler's citation of cases holding that a preferential transfer may be avoided if the transferee was an insider when the transfer was arranged, even though he was not an insider when the transfer occurred, see, e.g., Chase Manhattan Bank, N.A. v. Dent (In re Trans Air, Inc.), 79 B.R. 947, 947 (Bankr. S.D. Fla. 1987), is also unavailing. There is no indication that the payment of back rent and taxes was "arranged" in any meaningful sense, much less that it was arranged by Shaw. While it is true that there was an understanding between Tatum, Campbell, and Layton that the proceeds of the stock-purchase agreement would be used to pay the debtor's creditors, neither Shaw, Inc. nor Shaw was a party to this agreement and, as noted above, Shaw's relinquishment of his stock was not conditioned upon payment of the back rent and taxes owed to Shaw, Inc.

**10** Further, it appears to us that the provision of the bankruptcy code allowing the trustee to avoid fraudulent transfers may allow a trustee to avoid a transfer to a former insider, provided, of course, that the trustee can show, inter alia, that the transfer was made "with actual intent to hinder, delay, or defraud" or that the debtor "received less than a reasonably equivalent value" for the transfer. 11 U.S.C.A.§ 548(a) (West 1993). Thus, in addition to being unwise, the statutory interpretation proposed by Butler is unnecessary.

8

debtor is sufficiently close so as to subject the relationship to careful scrutiny." Hunter v. Babcock (In re Babcock Dairy Co.), 70 B.R. 662, 666 (Bankr. N.D. Ohio 1986). In order to satisfy this standard, the alleged insider "must exercise sufficient authority over the debtor so as to unqualifiably dictate corporate policy and the disposition of corporate assets." Id. That simply is not the case here. It is undisputed that although Shaw held the title of manager, he exercised no managerial authority over the debtor. He did not make personnel decisions, did not handle the payroll or accounts receivable, and was otherwise uninvolved in the management of the business. Also, we do not believe that Shaw's ability to secure employment for his wife and son indicates that Shaw possessed the ability to dictate corporate policy. We therefore reject Butler's contention that Shaw exercised such a degree of control over the debtor that Shaw, Inc. should be considered an insider.

III.

We therefore conclude that the bankruptcy court did not err in finding that Shaw, Inc. was not an insider at the time of the challenged transfers. Accordingly, we affirm.

AFFIRMED