### In re THREE FLINT HILL LIMITED PARTNERSHIP, Debtor.

### THREE FLINT HILL LIMITED PARTNERSHIP

### v.

### The PRUDENTIAL INSURANCE COMPANY.

Civil No. AW 97–1787, et al.
Bankruptcy No. 94–16079 PM.

United States District Court,
D. Maryland.

Sept. 29, 1997.

---

Michael J. Lichtenstein and Roger Frankel, Washington, DC, for appellant/cross-appellant.

Thomas J. Catliota and Patrick J. Potter, Washington, DC, for appellee/cross-appellant.

## MEMORANDUM DECISION

WILLIAMS, District Judge.

### I

In this consolidated appeal, the Three Flint Hill Limited Partnership (hereinafter sometimes "Three Flint Hill" and "the debtor") appeals from a number of orders of the Bankruptcy Court confirming a plan of reorganization under Chapter 11 of the Bankruptcy Code. The Bankruptcy Court confirmed the plan of the Prudential Insurance Company (hereinafter "Prudential"), the largest creditor of Three Flint Hill. Prudential's plan will liquidate the debtor's estate, with Prudential gaining control of the debtor's sole asset, an office building. Three Flint Hill appeals, claiming that the Bankruptcy Court erred in concluding that the debtor's reorganization plan was not confirmable. Three Flint Hill also contends that the court below erred in confirming the plan of Prudential. According to the debtor, Prudential did not submit its plan in "good faith." The debtor also argues that it was error to count the votes of Prudential against the debtor's plan because, allegedly, Prudential did not vote in "good faith." Prudential has filed a cross-appeal, arguing that the Bankruptcy Court committed reversible error by entering a cash collateral order without notice and a hearing, that the Bankruptcy Court committed reversible error by failing to grant Prudential relief from an automatic stay and by failing to grant two motions for lift-stay orders, and that the Bankruptcy Court abused its discretion in issuing a stay pending appeal. As shall be explained, the Court will affirm the decision of the Bankruptcy Court confirming the Prudential plan. Prudential's claims on its cross-appeal will be dismissed as moot.

### II

Three Flint Hill is a Virginia limited partnership that owns an office building located in Oakton, Virginia. The partnership has no employees and the building is the partnership's sole asset. Prudential made a nonrecourse loan, secured by a first deed of trust lien, in the principal amount of $19.8 million to the debtor in 1985 (and refinanced in 1990).

At the time of the loan, the building was fully leased to AT & T Communications, Inc. However, in October of 1994, AT & T decided not to renew its lease and left the property. Unable to secure a new tenant, Three Flint Hill failed to maintain its loan payments to Prudential. On October 20, 1994, Prudential sent the debtor a notice of default stating that if it did not cure the default, the entire indebtedness would accelerate. A notice of acceleration was sent on November 3, 1994. Prudential scheduled a foreclosure sale of the building for November 22, 1994.

On November 15, 1994, Jerome Kaplan, one of the partners of Three Flint Hill,[1] filed an involuntary bankruptcy petition against the debtor, staying the scheduled foreclosure

---

1. Three Flint Hill is a partnership comprised of 4 general partners and 8 limited partners. The general partners are Lawrence Lerner, Kaplan, Merrick Marshall, and Lerner Enterprises Limited Partnership (a partnership of several members of the Lerner family).

sale. On December 12, 1994, the Bankruptcy court entered its Order for Relief, initiating the bankruptcy proceedings.

During the 120 day period following the entry of the order, where only the debtor may file a plan of reorganization, no plan was filed. On September 12, 1995, Prudential filed a reorganization plan. This plan contained a reorganization option with would have reduced Prudential's loan claim from $20 million to $16.5 million, allowed the debtor to retain control of the building, permitting it to repay the debt over a seven year period. If the Three Flint Hill partners failed to elect reorganization within a certain amount of time after confirmation of the plan, the plan would convert to a liquidating plan. Under either option, all unsecured trade claims were to be immediately paid in full by Prudential.

The debtor filed a plan shortly thereafter, on October 3, 1995. Under the debtor's plan, all unsecured claims, except Prudential's, would essentially be paid in full within six months of the effective date of the plan. Of Prudential's claim of approximately $20.7 million, the debtor would pay the secured portion ($8.5 million) over a period of 15 years after confirmation. The remaining unsecured portion would receive only a one-time payment of 2.5% of the amount, followed by a promissory note, to be paid over two years, for another 5% of the amount of the debt. The partners pledged over $6 million to cover some of the expenses of the reorganization. Payments to Prudential were to come from revenues from a new lessee, Lockheed Martin Corporation ("LMC"). LMC had agreed, however, to only a seven year lease. During the initial seven year period, the partners of the debtor would recover their new investment of approximately $6 million plus profit.

The debtor's reorganization plan was comprised of five classes of creditors. In order for the debtor's plan to be confirmed, at least one impaired class had to accept it. Only Class 2 (Prudential's loan claim) and Class 4 (various trade creditor claims) contained the claims of impaired creditors entitled to vote.

Beginning in March of 1995, Prudential began acquiring unsecured trade claims against the debtor. Prudential offered to buy all unsecured claims at 100% of face value. Prudential voted all of its 29 acquired claims against the debtor's plan. Two claims, from Ace Uniform Services, Inc. (owed $313.99) and KT Enterprises, Inc. (owed $5,951.41), voted in favor of the debtor's plan. An additional 47 claims were voted in favor of the plan by Tarrant Partners Limited Partnership ("Tarrant").[2]

Prior to the bankruptcy proceedings, a representative of the debtor approached David Bonderman, the principal of Tarrant, to request that Tarrant pay approximately $123,000 of the debtor's trade debt. Mr. Bonderman, a friend and business associate of some of the partners, paid the obligation, despite the fact that the debtor had over $775,000 in cash on hand at the time. The debtor thereafter contended that Tarrant was a creditor. At a hearing during the bankruptcy proceedings on whether Tarrant was a creditor, Bonderman indicated that he paid the debt as an accommodation to his business partner. The court concluded that Tarrant was a creditor, but also concluded that it was an insider and did not count its vote.[3]

Thus, with 29 of the 31 counted claims voting against the debtor's plan, Class 2 did not accept the plan. Prudential, the only claim holder in Class 4, also rejected the debtors plan. The Bankruptcy Court concluded that because no class of impaired

---

**2.** The parties dispute whether Tarrant held 47 claims or a single claim against the debtor. The Bankruptcy Court below found that Tarrant held but one claim. However, in light of the Court's resolution of the issue of Tarrant's status as an "insider," this question becomes moot.

**3.** Another "creditor," Dr. Robert Schattner, a close friend of several partners of the debtor,

accommodated a request from a representative of the debtor to pay its property taxes in the amount of $98,000. While the debtor claimed that Dr. Schattner held a claim, the doctor indicated that he had never heard of Three Flint Hill and held no claim against it. To avoid testifying at trial, Dr. Schattner stipulated that his vote on the debtor's plan would not be counted.

creditors accepted the debtor's plan, it was not confirmable.

Under Prudential's plan, all trade creditor claims were unimpaired as they were to be fully paid with interest. Prudential, as the only impaired creditor, voted to confirm its own plan.

Before the final ruling of the Bankruptcy court, the debtor informed the court and Prudential that it would accept Prudential's plan and its "reorganization" option. The very next day, Prudential submitted a modified plan deleting the reorganization option and containing only provisions for liquidation. Under the terms of the liquidation, Prudential was to receive all rents from the building and acquire the building itself. As Prudential remained the only impaired creditor under the plan, it again voted to confirm its own plan. Because Prudential's plan was the only confirmable plan, the Bankruptcy Court confirmed the plan. The court indicated, however, that if the debtor's plan was confirmable and the court could decide between the two plans, it would accept the debtor's plan.

During the pendency of this action, the building's appraised value has increased from approximately $9.4 million (May 5, 1995) to over $20.7 million. Prudential has advanced the debtor an additional $5.8 million to make improvements to the building in order to facilitate re-leasing it. The new tenant, LMC, pays an annual base rent of over $2.7 million, allowing the debtor to resume partial payment on its obligation to Prudential. A January 1, 1997, order by the Bankruptcy court permitted the debtor to resume payments in the amount of $150,000 (later increased to $175,000) per month to Prudential.

## III

### A

This appeal is brought under Bankruptcy Rule 8001(a). The Court has jurisdiction over the matter pursuant to 28 U.S.C. § 158(a). The Court reviews the legal conclusions of the Bankruptcy Court de novo, but reviews its factual determinations for clear error. Bankruptcy Rule 8013; *Butler v. Shaw,* 72 F.3d 437, 441 (4th Cir.1996). A factual finding is clearly erroneous "when although there is evidence to support it, the reviewing court on the entire evidence is left with a firm and definite conviction that a mistake has been committed." *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948).

### B

A plan of reorganization may only be confirmed under 11 U.S.C. section 1129[4] where at least one class of impaired creditors, excluding insiders, accepts the plan.[5] The debtor claims that its plan would have been accepted by an impaired class of creditors, and thus confirmable, had the Bankruptcy Court not excluded the vote of Tarrant based on its insider status. Three Flint Hill contends that the Bankruptcy Court erred in concluding that the Tarrant was an "insider" within the meaning of the Code. The definitions section of the Code, at section 101, subdivision (31), attempts to clarify the term "insider" by providing certain specific categories of persons that are deemed insiders.[6] It is undisputed that Tarrant does not fall within any of these categories.

Nonetheless, because the statutory language merely "includes" types of persons deemed to be insiders, courts have found these categories to be nonexhaustive. "[A]n insider may be any person or entity whose

---

4. Unless otherwise indicated, all further statutory references, including references to "the Code," to 11 U.S.C.

5. Section 1129(a)(10) provides that a plan may be confirmed, where impaired classes exist, only where "at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any insider."

6. Section 101(31), in pertinent part, provides that " 'insider' includes . . .

    if the debtor is a partnership, a
    (i) general partner in the debtor;
    (ii) relative of a general partner in, general partner of, or person in control of the debtor;
    (iii) partnership in which the debtor is a general partner;
    (iv) general partner of the debtor; or
    (v) person in control of the debtor."

relationship with the debtor is sufficiently close so as to subject the relationship to careful scrutiny." *Butler v. Shaw,* 72 F.3d 437, 443 (4th Cir.1996); accord, e.g., *In re Broumas,* 203 B.R. 385, 391 (D.Md.1996); *In re Ribcke,* 64 B.R. 663 (Bankr.D.Md.1986). Courts generally hold, in accordance with the legislative history of Section 101(31), that insider status is determined by a factual inquiry into the closeness of the relationship between the parties and whether the transaction between the transferee and debtor was conducted at "arm's length." E.g., *In re Holloway,* 955 F.2d 1008, 1011 (5th Cir.1992); see Analysis of HR 8200, H.R.Rep. 595, 95th Cong. 1st Sess., 312 (1977); Analysis of S. 2266, S.Rep. 989, 95th Cong.2d Sess. 25 (1978), U.S.Code Cong. & Admin.News, p. 5787.

As a preliminary matter, it is necessary to clarify the standard of review for the Bankruptcy Court's determination of insider status. There is authority for the proposition that the determination is factual, to be reviewed for clear error. See *In re Missionary Baptist,* 712 F.2d 206, 209–210 (5th Cir. 1983) ("We perceive the insider determination to be a question of fact"); *In re Friedman,* 126 B.R. 63, 69 (9th Cir. BAP 1991) ("the determination of insider status is a question of fact"); Collier on Bankruptcy ¶ 101.30, at 101–72 (15th ed.1990). Some appellate courts, however, have suggested that because the analysis requires the application of the historical facts to the pertinent legal standard, the insider determination is more appropriately characterized as a mixed question of law and fact. See *In re Krehl,* 86 F.3d 737, 742 (7th Cir.1996) ("We think that the question is properly characterized as a mixed question of law and fact"); *In re Holloway,* 955 F.2d 1008, 1014 (5th Cir.1992) ("it would appear to us that once the underlying facts are resolved, insider status ultimately is question of law"); see also *In re Schuman,* 81 B.R. 583, 586 fn. 1 (9th Cir. BAP 1987). ■ The Fourth Circuit has acknowledged that "[o]n mixed questions, courts

have not defined any bright-line standard of review. Rather, the standard of review applied varies with the 'mix' of the mixed question." *United States v. Daughtrey,* 874 F.2d 213, 217 (4th Cir.1989). In general, this Court must review mixed questions "under a hybrid standard, applying to the factual portion of each inquiry the same standard applied to questions of pure fact and examining de novo the legal conclusions derived from those facts." *Gilbane Building Co. v. Federal Reserve Bank of Richmond,* 80 F.3d 895, 905 (4th Cir.1996). Yet, even assuming that the determination to be made here is a "mixed question," the factual question still predominates the ultimate "mix." It bears emphasis that the insider determination hinges on the closeness of the relationship between the parties; the ultimate inquiry is largely "a fact intensive, ad hoc analysis." *In re Chas. P. Young Co.,* 145 B.R. 131, 136 (Bankr.S.D.N.Y.1992). Accordingly, although this Court will scrutinize the Bankruptcy Court's conclusions in light of the pertinent legal principles, it will not lightly dismiss the lower court's view of the factual nature of the relationship.

■ The Bankruptcy Court's insider analysis turned on the conclusion that Tarrant's arrangement with the debtor to purchase some of its debt was less than an "arms-length" transaction. David Bonderman, who operates the Tarrant partnership, had been involved in a number of private partnerships with a general partner of the debtor.[7] The relationship extended for over ten years, with roughly $50 million being invested with Bonderman. A representative of the debtor contacted Bonderman, asking him to purchase several of its obligations. It was understood that the assumed obligations, totaling approximately $123,000, were to be repaid to Bonderman out of the bankruptcy. Bonderman agreed to the debtor's proposal because the amount of the transaction was relatively small and because Bonderman wanted to accommodate his

---

**7.** It is true that the relationship here is between Bonderman and one of the general partners of the debtor, rather than between Tarrant and the debtor. Nonetheless, because Bonderman controls Tarrant, and thus controls the obligations that Tarrant undertakes, and given the intensely factual nature of the inquiry, he will stand in the shoes of Tarrant for purposes of whether an "insider" relationship exists with the debtor or those who control the debtor.

business associate. Assuming the transaction went well, the best possible return Bonderman expected was approximately five percent. On cross-examination, Bonderman stated that he was not interested in being paid by Prudential the face amount of the claim with 15 percent interest; indeed, he indicated that he would not accept more than twice the amount of the claim. A representative of the debtor testified that Tarrant was enlisted to purchase the obligations so that the claims would be "in the hands of reasonable and friendly creditors." From this, the Bankruptcy Court found that Tarrant's purchase of the debtor's obligations was not a "carefully reasoned business decision," but instead an accommodation to a friend or business partner. Adopting an expansive view of the definition of "insider," the Court below concluded that Tarrant was, in fact, an "insider" to the debtor.

The debtor does not appear to quarrel with the factual inferences drawn by the Bankruptcy Court; instead, it maintains that because there was no evidence that it exercised any "control" over Tarrant, or vice versa, there was simply no legally sufficient basis for concluding that Tarrant was an insider. Whether control is a prerequisite for insider status is a legal question subject to this Court's plenary review. The debtor observes that "[o]ften considered by most courts as the controlling considerations [of insider analysis] are the closeness of the parties *and the relative degree of control each has over the other.*" *In re Gilbert,* 104 B.R. 206, 210 (Bankr.W.D.Mo.1989) (emphasis supplied). A close personal relationship, standing alone, is not enough to confer insider status. *In re Badger Freightways, Inc.,* 106 B.R. 971, 982 (Bankr.N.D.Ill.1989). From this, Three Flint Hill contends that there must be some showing of control before Tarrant may be considered an insider. The debtor notes that in *Butler, supra,* 72 F.3d 437, the Fourth Circuit opined that while the statutory definition of an insider is not exclusive, the "alleged insider must exercise sufficient authority over the debtor so as to unqualifiably dictate corporate policy and the disposition of corporate assets." *Id.* at p. 443.

Control is certainly probative of an insider relationship. *In re Locke Mill Partners,* 178 B.R. 697, 702 (Bankr.M.D.N.C. 1995) ("one of the controlling considerations is the relative degree of control which either has over the other"). Indeed, a person in "control" of the debtor is an insider by the terms of section 101(31), without resort to the factual circumstances of the relationship between the parties. However, control is not dispositive of an insider relationship. *In re Locke Mill, supra,* 178 B.R. at p. 702. "[A]ctual control is not a predicate to finding someone to be an extra-statutory insider." *In re Broumas,* 203 B.R. 385, 390 (D.Md. 1996). Again, the overwhelming weight of authority supports the proposition that the statutory categories of "insiders" are not exhaustive, and that an "insider" relationship may be found where the relationship between the parties is sufficiently close to warrant careful scrutiny. The purpose of this inquiry is to guard against collusive approval of plans by persons whose dealings with the debtor are "at less than arm's length." E.g, *In re ASI Reactivation,* 934 F.2d 1315, 1323, fn. 3 (4th Cir.1991); *Holloway, supra,* 955 F.2d 1008, 1010–1011 (5th Cir.1992); *Missionary Baptist, supra,* 712 F.2d 206, 209 (5th Cir. 1983); *Krehl, supra,* 86 F.3d 737, 741 (7th Cir.1996); *In re Newcomb,* 744 F.2d 621, 625, fn. 4 (8th Cir.1984); *Schuman, supra,* 81 B.R. 583, 586 fn. 1 (9th Cir. BAP 1987); *Broumas, supra,* 203 B.R. 385, 391 (D.Md. 1996); *Locke Mill, supra,* 178 B.R. 697, 702 (Bankr.M.D.N.C.1995); *Gilbert, supra,* 104 B.R. 206, 209 (Bankr.W.D.Mo.1989).

While the statutory categories of "insiders" are nonexhaustive, courts should look to the categories to determine the types of relationships that fall within the scope of insider exclusion. *In re Ingleside Associates,* 136 B.R. 955, 961 (Bankr.E.D.Pa.1992). Notably, one of the statutory categories of "insider" is a relative of a person in control of the debtor. Section 101(A)(31)(ii). In general, relatives do not possess any formal "control" over each other. Yet, Congress has conclusively presumed that transactions between relatives are "insider" transactions. Obviously, Congress has made this presumption because of the high probability that

transactions between relatives will be motivated by affinity rather than independent business judgment. See *In re Montanino,* 15 B.R. 307, 309–310 (Bankr.D.N.J.1981). Clearly, then, Congress did not intend the insider determination to rest on a finding of actual control, but a finding that, given the relationship and conduct of the parties, the relevant transaction or arrangement was entered into based on that relationship rather than an independent purpose or motivation. See *In re McIver,* 177 B.R. 366, 370 (Bankr. N.D.Fla.1995) ("A business, professional, or personal relationship, that compels the conclusion that the transferee could be able to gain an advantage such as that attributable simply to affinity, would result in the transferee being classified as an insider").

The debtor's contention that *Butler, supra,* 72 F.3d 437, predicates insider status upon a finding of "control" reads too much into *Butler.* There, the Fourth Circuit reviewed the Bankruptcy Court's conclusion that an employee of the debtor, who exercised no managerial authority and had no power to dispose of corporate assets, was not an "insider" of the debtor. The Fourth Circuit, in requisite deference to the Bankruptcy Court's view of the factual nature of the relationship, concluded that absent some showing of control, the evidence there was insufficient to warrant a finding of insider status in light of the Bankruptcy Court's contrary conclusion. See *Butler, supra,* 72 F.3d at p. 443.

Here, by contrast, the Bankruptcy Court has concluded that there was, in fact, an insider relationship between Tarrant and the debtor. While it is clear that an arm's-length transaction between even close associates does not confer insider status, the evidence here demonstrates that Tarrant entered into its agreement to assume the debtor's obligation at substantially less than "arm's length." "An 'arm's length' transaction is one entered into in good faith in the ordinary course of business by unrelated parties with independent interests" as opposed to a transaction "incurred as an insider arrangement with a closely-held entity." *In re Valley Steel Corp.,* 182 B.R. 728, 735 (Bankr.W.D.Va.1995). As the Bankruptcy court noted, there appeared little business

reason or motivation for Tarrant to enter into the agreement. Further, Mr. Bonderman, the principal of Tarrant, asserted that he would not accept complete satisfaction of the obligation, plus a substantial profit, from Prudential. The record supports the Bankruptcy Court's conclusion that Tarrant acted as an "insider" to the debtor, entering into the agreement with the debtor for the primary purpose of facilitating the debtor's efforts to confirm its own plan.

This result is consonant with the underlying purpose of insider exclusion. "The primary objective of Section 1129(a)(10)'s insider component is to forestall the voting of a creditor who is so beholden to or controlled by the debtor as to in effect be an alter ego of the debtor." *Gilbert, supra,* 104 B.R. 206, 210; *In re Piece Goods Shops,* 188 B.R. 778, 798 (Bankr.M.D.N.C.1995). Because "the point of Section 1129(a)(10) is to prevent the Bankruptcy Court from becoming a dumping ground for two party disputes," an accepting impaired class "must have a genuine interest in the reorganization." *In re Barakat,* 173 B.R. 672, 681 (Bankr.C.D.Cal.1994), aff'd, 99 F.3d 1520 (9th Cir.1996). It would defeat the purpose of Section 1129(a)(10) to permit a reorganization plan to be imposed upon Prudential, the holder of approximately 99 percent of Three Flint Hill's debt, based on the vote of Tarrant, who has little true interest in the reorganization, but is simply a creditor by virtue of its agreement to assume obligations for the purpose of accommodating its business associate. See *Barakat, supra,* 173 B.R. at p. 681 (inasmuch as former tenant owed security deposit is not a creditor with a "true interest in reorganization," his acceptance should not permit imposition of "cram down" reorganization on principal creditor); *In re Franklin Mortgage & Investment Co., Inc.,* 143 B.R. 295, 300, fn. 1 (Bankr.D.D.C.1992) (acceptance of accountant, owed $5000, should not satisfy 1129(a)(10) so that plan may be imposed over objection of secured creditor owed $2.25 million).

In conclusion, insider status may be based on "a professional or business relationship with the debtor," where the conduct of the creditor or the debtor is "attributable

simply to affinity rather than to the course of business dealings between the parties." *Friedman, supra,* 126 B.R. 63, 70 (B.A.P.9th Cir.1991). The Bankruptcy Court reasonably found that Tarrant's conduct here was attributable to affinity rather than the ordinary course of business. Thus, the Court affirms the determination of the Bankruptcy Court that Tarrant was an "insider," and its consequent finding that the debtor's plan of reorganization was not confirmable.

## C.

The debtor also contends that Prudential proposed its plan, and cast its votes in opposition to the debtor's reorganization plan, in bad faith. Section 1129, subdivision (a)(3) requires that a plan be submitted in "good faith." Further, pursuant to Section 1126, subdivision (e), the Bankruptcy Court has the power to designate (i.e., disallow) the vote of any creditor that does not cast its vote in "good faith." While the Code does not define "good faith," the courts have fashioned guidelines for making the determination. A creditor does not act in "good faith" where it casts its vote "with a purpose of coercing payment ... of more than he might reasonably perceive as his fair share of the debtor's estate," or where the creditor casts his vote for an "ulterior purpose." *In re Federal Support Co.* 859 F.2d 17, 19 (4th Cir.1988). Such ulterior purposes include "pure malice, 'strikes,' and blackmail, and the purpose to destroy an enterprise in order to advance the interests of a competing business." *Ibid.*

The debtor argues that Prudential acted with an "ulterior motive"—to obtain ownership of the debtor's property. The debtor continues that Prudential's bad faith exemplified by the fact that Prudential first proposed a plan that included reorganization, but withdrew the plan shortly after the debt-

or agreed to it and substituted a pure liquidation plan.

Nonetheless, even assuming that Prudential acted with the motive the debtor ascribes to it, it is by now well settled that a creditor does not act in bad faith simply by pursuing its own self-interest. E.g., *Federal Support, supra,* 859 F.2d 17, 20; *In re SPM Manufacturing,* 984 F.2d 1305, 1317–1318 (1st Cir.1993); *In re Frank Fehr Brewing Co.,* 268 F.2d 170, 180 (6th Cir.1959) Further, evidence that a creditor "never intended to cooperate with [a debtor] and considered liquidation to be the only solution" does not establish a lack of good faith. *Hanson v. First Bank of South Dakota,* 828 F.2d 1310, 1315 (8th Cir.1987). Similarly, the fact that Prudential purchased and voted the claims of smaller creditors for the purpose of preventing confirmation of the debtor's plan does not demonstrate a lack of good faith. *In re 255 Park Plaza,* 100 F.3d 1214, 1219 (6th Cir. 1996); see *In re Figter Limited,* 118 F.3d 635, 639 (9th Cir.1997). It is quite possible that Prudential believed that the liquidation of the debtor's estate was the most effective way to maximize the amount recovered from the defaulted loan. The fact that Prudential may have began with a different point of view before changing its mind does not lead to the conclusion that it possessed some unseen motive in pursuing its new course. The debtor points to no evidence that suggests that Prudential was motivated by anything but self-interest. Further, there is no showing that Prudential sought any more than it was entitled as a bona fide creditor. On this record, the Court concludes that Prudential offered its amended plan, and voted against the debtors plan, in good faith.[8] The like determination of the Bankruptcy Court is affirmed.

8. There is some question as to the standard of review to be applied in determining whether Prudential acted in "good faith." In the context of whether the directors of a corporation acted in "good faith" and in the best interests of a corporation, the Fourth Circuit suggested, without deciding, that "[t]he good faith determination strikes us as a question of law, or at least a mixed question of law and fact." *In re Landmark Land,* 76 F.3d 553, 561, fn. 4 (4th Cir.1996); but cf. *Figter Limited, supra,* 118 F.3d 635, 638 (9th Cir.1997) (in context of confirmation of Chapter 11 reorganization plan, a decision that creditor "did or did not act in good faith is one where the determination is 'an essentially factual inquiry' and is driven by the data of practical human experience," subject to review for clear error). The Court need not express any view on the standard of review to be applied here, as Prudential's good faith appears under any standard.

## IV

Prudential has filed a cross-appeal, raising a number of issues. It argues that the Bankruptcy Court committed error in entering a Cash Collateral Order, permitting the debtor to spend over $50,000 of Prudential's cash collateral each month,[9] without affording Prudential a hearing. Prudential also contends that the Bankruptcy Court erred in failing to grant relief from the automatic stay. It similarly contends that the Bankruptcy Court erred in failing to grant two motions brought by Prudential for lift-stay orders. Prudential finally argues that the Bankruptcy Court committed error in entering a stay pending appeal.

Prudential concedes, however, that all of the issues raised in its cross-appeal will become moot if this Court affirms the Bankruptcy Court's confirmation of the Prudential plan. In light of the Court's ruling, each of Prudential's claims on its cross-appeal are dismissed as moot.

## V

The Court has, by stipulation of the parties, stayed briefing on Prudential's appeals of the Bankruptcy Court's denial of its motion to open the record to value collateral and its motion to withdraw section 1111(b) election. Prudential concedes that both issues are mooted by this Court's affirmance of the Bankruptcy Court's Order of Confirmation. In light of the Court's ruling, both of these issues are moot and are dismissed as such.

## VI

For the reasons set forth, the decision of the Bankruptcy Court is affirmed. A separate Order will issue.

## ORDER

In accordance with the Memorandum Opinion, it is this 29th day of September 1997 ORDERED:

1. That the Order below Denying Confirmation of the Debtor's Plan of Reorganization be, and the same hereby is, AFFIRMED.

2. That the Order below Confirming Prudential Plan be, and the same hereby is, AFFIRMED.

3. That the Order below Denying Debtor's Section 1126(e) Motion to designate Prudential's claims and votes with respect to the Debtor's Plan be, and the same hereby is, AFFIRMED.

4. That Prudential's appeal of the Order below Modifying the Order Regarding Debtor's Use of Cash Collateral be, and the same hereby is, DISMISSED as moot.

5. That Prudential's appeal of the May 12, 1997, Order below Denying Prudential's Lift–Stay Motion be, and the same hereby is, DISMISSED as moot.

6. That Prudential's appeal of the May 29, 1997, Order below Denying Prudential's Lift–Stay Motion be, and the same hereby is, DISMISSED as moot.

7. That Prudential's appeal of the Order Granting the Debtor's Motion for a Stay Pending Appeal be, and the same hereby is, DISMISSED as moot.

8. That Prudential's appeal of the Order Denying Prudential's Motion to Reopen the Record to Value Collateral be, and the same hereby is, DISMISSED as moot.

9. That Prudential's appeal of the Order Denying Prudential's Motion for Entry of an Order Permitting Prudential to Withdraw its Section 1111(b) Election be, and the same hereby is, DISMISSED as moot.

10. That the Clerk of the Court CLOSE cases 97–1787, 97–2013, 97–2105, 97–2106, 97–2107, 97–2116, 97–2269, 97–2365 and 97–2366.

11. That the Clerk of the Court mail copies of the Memorandum Opinion and this Order to all counsel of record.

---

**9.** The money was to be used to maintain payments to Prudential on the debtor-in-possession loan made for renovations to the building.